# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Matthew J. Brouillette and Rep.  :
James Christiana and Benjamin  :
Lewis,  :
   :
                    Petitioners  :
   :
             v.  : No. 410 M.D. 2017
   : Argued: September 13, 2018
Thomas Wolf, Governor and Joseph  :
Torsella, Treasurer and Eugene  :
DePasquale, Auditor General and  :
The Commonwealth of Pennsylvania  :
and Michael Turzai, Speaker of the  :
House of Representatives and Dave  :
Reed, House Majority Leader and  :
Joseph B. Scarnati, III, President Pro  :
Tempore of the Senate and Jake  :
Corman, Senate Majority Leader and  :
The Pennsylvania General Assembly,  :
   :
                    Respondents:

BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
                     HONORABLE RENÉE COHN JUBELIRER, Judge
                     HONORABLE ROBERT SIMPSON, Judge
                     HONORABLE P. KEVIN BROBSON, Judge
                     HONORABLE PATRICIA A. McCULLOUGH, Judge
                     HONORABLE MICHAEL H. WOJCIK, Judge
                     HONORABLE ELLEN CEISLER, Judge

OPINION BY JUDGE WOJCIK                   FILED: July 2, 2019

       Before the Court are the various preliminary objections (POs) filed by

Respondents[1] to the amended petition for review (Amended Petition) filed by

---

[1] Four sets of POs were filed by the following Respondents: (1) Thomas Wolf, Governor of Pennsylvania (Governor), and the Commonwealth of Pennsylvania (Commonwealth)
**(Footnote continued on next page…)**

Matthew J. Brouillette, Representative James Christiana, and Benjamin Lewis (collectively, Petitioners) challenging the constitutionality of some of the actions taken by Respondents with regard to the state budget for fiscal years (FY) 2016-17 and FY2017-18.[2]  Senate Respondents have also filed an Application to Dismiss for Mootness (Application).  We overrule the POs in part, sustain the POs in part, grant the Application, and dismiss the Amended Petition.

Petitioners filed the three-count Amended Petition alleging that Respondents have violated various constitutional provisions by establishing unbalanced budgets and authorizing loans to cover deficits that extended beyond the relevant fiscal years.  With regard to FY2016-17, Petitioners allege that the General Operating Fund Budget closed with a $1.55 billion deficit in violation of Article 8, Section 12(a)[3] and Section 13(a) of the Pennsylvania Constitution[4] and

---

**(continued…)**

(collectively, Commonwealth Respondents); (2) Joseph Torsella, Treasurer (Treasurer); (3) Jake Corman, Senate Majority Leader, and Joseph B. Scarnati, III, President Pro Tempore of the Senate (Senate Respondents); and (4) Michael Turzai, Speaker of the House of Representatives, and Dave Reed, House Majority Leader (House Respondents).  To a large extent, the POs overlap.  Respondent Eugene DePasquale, Auditor General (Auditor General), did not object, but instead filed an answer to the Amended Petition and a notice of non-participation in these proceedings.

[2] *See* Section 617(a) of the Administrative Code of 1929 (Administrative Code), Act of April 9, 1929, P.L. 177, *as amended*, added by the Act of September 27, 1978, P.L. 775, 71 P.S. §237(a) ("The fiscal year shall be the period beginning on July 1 of each calendar year and ending on June 30 of the calendar year next succeeding.").

[3] Article 8, Section 12(a) provides:

Annually, at the times set by law, the Governor shall submit to the General Assembly:

**(Footnote continued on next page…)**

2

(continued…)

> (a) A balanced operating budget for the ensuing fiscal year setting forth in detail (i) proposed expenditures classified by department or agency and by program and (ii) estimated revenues from all sources. If estimated revenues and available surplus are less than proposed expenditures, the Governor shall recommend specific additional sources of revenue sufficient to pay the deficiency and the estimated revenue to be derived from each source[.]

Pa. Const. art. VIII, §12(a).

Likewise, Section 613(1) of the Administrative Code states, in pertinent part:

> As soon as possible after the organization of the General Assembly, but not later than the first full week in February of each year, . . . the Governor shall submit to the General Assembly copies of original agency budget requests and all subsequent revised agency budget requests and a State budget and program and financial plan embracing:
>
> (1) A balanced operating budget for the ensuing fiscal year setting forth in detail:
>
> (i) The amounts recommended by him to be appropriated to the General Assembly, the Judicial Department, the Governor, and the several administrative departments, boards, and commissions of the State Government, and to institutions within the State, and for all public purposes, classified by department or agency and by program.
>
> (ii) The estimated revenues or receipts from any and all sources, and an estimated amount to be raised by taxation or otherwise, including proposals for new revenues and receipts.

71 P.S. §233(a)(1). *See also* Section 701(g) of the Administrative Code, 71 P.S. §241(g) ("The Governor shall have the power and it shall be his duty . . . [t]o submit to the General Assembly a State budget[.]").

Section 618(a) of the Administrative Code.[5]  To fulfill the Commonwealth's debt obligations, Petitioners claim that the Governor, Treasurer, and Auditor General approved a $750 million line of credit in August 2017, which was used, in part, to address the $1.55 billion deficit from the prior fiscal year.  Because of this borrowing, Petitioners contend that Respondents violated Article 8, Section 7(a)(2)(ii) of the Pennsylvania Constitution.[6]  In addition, Petitioners claim that as revenues failed to materialize, the General Assembly and the Governor had a duty to cut spending to ensure a fully funded budget.  This resulted in a deficit, which Petitioners refer to as an "unfunded loan" that "illegally followed the Commonwealth" into the current fiscal year.  Amended Petition ¶51.

---

**(continued…)**

[4] Article 8, Section 13(a) provides, "Operating budget appropriations made by the General Assembly shall not exceed the actual and estimated revenues and surplus available in the same fiscal year." Pa. Const. art. VIII, §13(a).

[5] 71 P.S. §238(a).  Section 618(a) states, in pertinent part:

> (a) The Department of Revenue in conjunction with the Secretary of the Budget shall make revenue estimates for the use of the Governor in preparing the budget with periodic revisions until the final estimate is signed by the Governor not later than the time he signs the general appropriations bill.  The revenue estimates used to sign any appropriation bill shall show separately State revenues, Federal funds, and, if specifically appropriated, funds from other sources. The Governor shall item veto any part of any appropriation bill that causes total appropriations to exceed the official estimate plus any unappropriated surplus.

[6] Article 8, Section 7(a)(2)(ii) states, "The Governor, State Treasurer and Auditor General, acting jointly, may . . . incur debt for the purpose of refunding other debt, if such refunding debt matures within the term of the original debt." Pa. Const. art. VIII, §7(a)(2)(ii).

Additionally, Petitioners assert that this deficit was then compounded by the enactment of the budget for the FY2017-18 when the General Assembly passed a $31.38 billion General Appropriations Bill, which became law when the Governor failed to act on it. At the time of its passage, there was no revenue package in place to fund it. Petitioners maintain that the expenditures exceeded actual and estimated revenues in violation of the Constitution. Finally, Petitioners argue that the Governor had the authority and the duty under Article 4, Sections 15[7] and 16 of the Pennsylvania Constitution[8] to veto the budget, in whole or in part, but failed to do either.

---

[7] Article 4, Section 15 provides, in relevant part:

> Every bill which shall have passed both Houses shall be presented to the Governor; if he approves he shall sign it, but if he shall not approve he shall return it with his objections to the House in which it shall have originated, which House shall enter the objections at large upon their journal, and proceed to re-consider it. If after such re-consideration, two-thirds of all members elected to that House shall agree to pass the bill, it shall be sent with the objections to the other House by which likewise it shall be re-considered, and if approved by two-thirds of all members elected to that House it shall be a law . . . . If any bill shall not be returned by the Governor within ten days after it shall have been presented to him, the same shall be a law in like manner as if he had signed it, unless the General Assembly, by their adjournment, prevent its return, in which case it shall be a law, unless he shall file the same, with his objections, in the office of the Secretary of the Commonwealth, and give notice thereof by public proclamation within thirty days after such adjournment.

Pa. Const. art. IV, §15.

[8] Article 4, Section 16 states:

> The Governor shall have power to disapprove of any item or items of any bill, making appropriations of money, embracing

**(Footnote continued on next page…)**

5

In Count I, Petitioners seek declaratory judgment against the Governor on the grounds that he violated Article 4, Sections 15 and 16 of the Pennsylvania Constitution, and Section 618 of the Administrative Code, by not vetoing all or part of the $31.38 billion General Appropriations Bill for FY2017-18 that exceeded estimated revenue thereby "authorizing the Commonwealth to appropriate and spend funds that exceeded actual and estimated revenues." Amended Petition at 27.

In Count II, Petitioners seek declaratory judgment against the Governor, Senate Respondents, House Respondents, and the Commonwealth generally on the grounds that they violated Article 8, Section 13 of the Pennsylvania Constitution because "the Commonwealth ended [FY2016-17] with a $1.55 billion deficit," and "the General Appropriations Bill for [FY2017-18] violates [Article 8, Section 13] because, at the time of enactment, appropriations contained therein 'exceed[ed] the actual and estimated revenues and surplus available in the same fiscal year[]' by $600 million." Amended Petition at 29.

Finally, in Count III, Petitioners seek declaratory relief against the Governor, the Treasurer, the Auditor General, and the Commonwealth generally for violating Article 8, Sections 7 and 12 of the Pennsylvania Constitution "by authorizing lines of credit to fund a $1.55 billion deficit accrued in [FY2016-17]

---

**(continued…)**

distinct items, and the part or parts of the bill approved shall be the law, and the item or items of appropriation disapproved shall be void, unless re-passed according to the rules and limitations prescribed for the passage of other bills over the Executive veto.

Pa. Const. art. IV, §16. *See also* Section 618(a) of the Administrative Code, 71 P.S. §238(a), *supra*.

6

. . . that spanned across multiple fiscal years," and "[t]hat the General Appropriations Bill for [FY2016-17] violated the Pennsylvania Constitution by appropriating funds in excess of anticipated revenues, thereby saddling the Commonwealth with a debt of $1.55 billion without the explicit approval of the General Assembly." Amended Petition at 36.

Respondents filed a joint motion to dismiss for mootness alleging that the subsequent passage of legislation eliminating any deficit from the past and current fiscal years' budget and appropriations bills rendered Petitioners' claims moot. This Court denied the joint motion on the basis that there are factual matters in dispute, such as whether the General Operating Fund Budget is currently balanced, and because Respondents did not explain how the subsequent legislation mooted the claim that they engaged in long-term borrowing in violation of Article 8, Section 7 of the Pennsylvania Constitution. *Brouillette v. Wolf* (Pa. Cmwlth., No. 410 M.D. 2017, filed December 28, 2017), slip op. at 10.

Respondents also filed four sets of POs.[9] Respondents variously object on the following bases: (1) Petitioners lack capacity to sue (standing); (2) the Amended Petition is insufficiently specific; and (3) the Amended Petition fails to conform to the law or rule of court. In addition, Respondents demur on the following grounds: that the Amended Petition (1) presents a non-justiciable

---

[9] "In ruling on preliminary objections, the courts must accept as true all well-pled facts that are material and all inferences reasonably deducible from the facts." *Pennsylvania Independent Oil & Gas Association v. Department of Environmental Protection*, 135 A.3d 1118, 1123 (Pa. Cmwlth. 2015), *aff'd*, 161 A.3d 949 (Pa. 2017) (quoting *Guarrasi v. Scott*, 25 A.3d 394, 400 n.5 (Pa. Cmwlth. 2011)). "However, we 'are not required to accept as true any unwarranted factual inferences, conclusions of law or expressions of opinion.'" *Id.* (quoting *Guarrasi*, 25 A.3d at 400 n.5). "To sustain preliminary objections, 'it must appear with certainty that the law will permit no recovery' and '[a]ny doubt must be resolved in favor of the non-moving party.'" *Id.* (quoting *Guarrasi*, 25 A.3d at 400 n.5).

political question; (2) fails to meet the standard for declaratory judgment; (3) fails to state a claim against the Commonwealth or the Treasurer; (4) is moot; and (5) is barred by the doctrine of laches. Respondents also assert that the Senate and House Respondents are protected by legislative immunity and/or sovereign immunity. Subsequently, on September 6, 2018, the Senate Respondents filed the instant Application to dismiss Count II of the Amended Petition for mootness because no practical relief may be granted for the legal claim presented therein based on a change in circumstance and the requested relief is not precluded by our prior opinion.[10]

## I.

## A.

As a preliminary matter, Respondents first claim that Petitioners Brouillette and Lewis do not possess standing to prosecute the instant matter. In general, the question of standing relates to whether a party is entitled to have the court decide the merits of a dispute or of particular issues. *Warth v. Seldin*, 422 U.S. 490, 498 (1975). As the United States Supreme Court has stated:

> A federal court cannot "pronounce any statute, either of a State or of the United States, void, because irreconcilable with the Constitution, except as it is called upon to adjudge the legal rights of litigants in actual controversies." Have the appellants alleged such a

---

[10] Pa. R.A.P. 1972(a)(4) provides that "any party may move . . . [t]o dismiss for mootness." "The mootness doctrine requires that an actual case or controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Pap's A.M. v. City of Erie*, 812 A.2d 591, 600 (Pa. 2002). "Pa. R.A.P. 1972[(a)](4) permits a party to move for dismissal for mootness during litigation." *Harris v. Rendell*, 982 A.2d 1030, 1035 (Pa. Cmwlth. 2009), *aff'd*, 992 A.2d 121 (Pa. 2010).

personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions? This is the gist of the question of standing[.]

*Baker v. Carr*, 369 U.S. 186, 204 (1962) (citation omitted).

Thus, "in order to have standing, a party must have an interest in the controversy that is distinguishable from the interest shared by other citizens. *William Penn Parking Garage, Inc. v. City of Pittsburgh*, [346 A.2d 269 (Pa. 1975)]." *Sprague v. Casey*, 550 A.2d 184, 187 (Pa. 1988). To surpass the common interest shared by other citizens, the interest of a party must be "substantial, direct and immediate." *Id.*

In this case, with respect to all three counts in the Amended Petition, Petitioners Brouillette and Lewis allege that they have standing in this matter based on their status as taxpayers in this Commonwealth. *See* Amended Petition ¶¶8-10, 85-88. Regarding taxpayer standing, this Court has noted:

> [T]he parameters of taxpayer standing in this Commonwealth have been defined by our Supreme Court in the case of *Application of Biester v. Thornburgh*, [409 A.2d 848 (Pa. 1979)]. In that case, our Supreme Court stated that the "purpose of the requirement of standing is to protect against improper plaintiffs." *Id.* [at 851]. In order to meet this requirement, a plaintiff must allege and prove an interest in the outcome of the suit, which surpasses "the common interest of all citizens in procuring obedience to the law." *Id.* [(citation omitted)]. To surpass the common interest of all citizens, the interest must be substantial, direct, and immediate. *Id.*
>
> Nevertheless, the Supreme Court recognized that certain cases exist in which the facts warrant the granting of standing to taxpayers where their interests arguably are not substantial, direct and immediate. *Biester*, [409 A.2d at 852]; *Consumer Party of Pennsylvania v.*

9

*Commonwealth*, [507 A.2d 323, 328 (Pa. 1986)]. The relaxing of those interest requirements in certain cases where there is little causal connection between the action complained of and the alleged injury is best explained by the basic policy considerations underlying taxpayer standing. *Consumer Party*, [507 A.2d at 328]. Our Supreme Court articulated these policy considerations in *Biester* as follows:

> "The ultimate basis for granting standing to taxpayers must … be sought outside the normal language of the courts. Taxpayers' litigation seems designed to enable a large body of the citizenry to challenge governmental action, which would otherwise go unchallenged in the courts because of the standing requirement. Such litigation allows the courts, within the framework of traditional notions of 'standing,' to add to the controls over public officials inherent in the elective process the judicial scrutiny of the statutory and constitutional validity of their acts."

*Biester*, [409 A.2d at 851 n.5 (citation omitted)].

In *Consumer Party*, the Supreme Court held that a taxpayer seeking standing to sue must allege a substantial, direct and immediate interest in the outcome of the suit *unless the taxpayer can show*:

1. the governmental action would otherwise go unchallenged;

2. those directly and immediately affected by the complained of expenditures are beneficially affected and not inclined to challenge the action;

3. judicial relief is appropriate;

4. redress through other channels is unavailable; and

5. no other persons are better situated to assert the claim.

10

*Consumer Party*, [507 A.2d at 329].

*Common Cause/Pennsylvania v. Commonwealth*, 710 A.2d 108, 115-16 (Pa. Cmwlth. 1998), *aff'd*, 757 A.2d 367 (Pa. 2000) (emphasis in original). *See also Fumo v. City of Philadelphia*, 972 A.2d 487, 504 (Pa. 2009) (listing the five factors to be considered in conferring taxpayer standing); *Stilp v. Commonwealth*, 940 A.2d 1227, 1233 (Pa. 2007) (same).

In *Consumer Party*, an organization and several citizen-taxpayers commenced an action in this Court seeking a declaration that the Public Official Compensation Law[11], an act providing for increased compensation to public officials, was unconstitutionally enacted and unconstitutional in its substantive provisions. *Id.* at 326-27. In considering whether the organization and the taxpayers possessed standing to present these claims, the Pennsylvania Supreme Court observed:

> We believe the circumstances of the instant case establish the above five factors and therefore warrant the grant of standing to appellants under the narrow exception outlined in *Biester*. This case presents a prime example of governmental action, which would otherwise go unchallenged because the very individuals who enacted the legislation are directly and beneficially affected and are thus not inclined to challenge the constitutionality of the legislation. Furthermore, judicial relief is appropriate since the determination of the constitutionality of an act is a function ultimately left to the courts. Moreover, here redress through other channels is unavailable. There is no administrative agency which can provide relief and the legislators themselves are unlikely to provide a meaningful mechanism for redress. Lastly, there are not other persons better situated to assert the claim because all those who are directly and immediately affected by the

---

[11] Act of September 30, 1983, P.L. 160, *as amended*, 65 P.S. §§366.1 – 366.5b.

[Public Official] Compensation Law are beneficially affected and have not brought, and will not bring a cause of action. Thus, there are no possible plaintiffs who can assert a substantial, direct and immediate interest.

*Id.* at 329 (citations omitted).

Additionally, in *Common Cause/Pennsylvania*, a number of organizations commenced an action in this Court seeking a declaration that an act substantially amending the Public Transportation Law[12] and the Vehicle Code[13] was unconstitutionally enacted. *Id.* at 111. In considering whether the organizations possessed standing to challenge the enactment, we noted:

> Based upon the above five factors, we conclude that the circumstances of the present case warrant the granting of standing to petitioners. We believe that the actions taken by the General Assembly in passing HB 67 would likely go unchallenged but for the present proceeding, because the very individuals who enacted such legislation are not going to be inclined to challenge the constitutionality of the process by which [the statute] was enacted. We further believe that judicial relief may be appropriate since the ultimate function of the judiciary is to determine the constitutionality of an act. Moreover, redress through other channels is unavailable as there is no administrative agency which can provide relief and the members of the General Assembly, themselves, are unlikely to provide a meaningful mechanism for redress. Finally, we believe that there are no other persons better situated to assert the constitutional claims which have been raised in the present case than petitioners.

*Id.* at 116 (citations omitted).

Similarly, in *Seeton v. Pennsylvania Game Commission*, 937 A.2d 1028 (Pa. 2007), a taxpayer initiated a mandamus action against the State Game

---

[12] 74 Pa. C.S. §§1101-1520.

[13] 75 Pa. C.S. §§101-9805.

12

Commission (Commission) seeking to compel the Commission to enforce the Pennsylvania Game and Wildlife Code[14] and its regulations to prevent a hunting preserve's "canned hunts" in which customers pay a fee to shoot and kill animals in an enclosed area. The taxpayer filed suit after the Commission determined that it lacked jurisdiction over the preserve's canned hunts. Both this Court and the Supreme Court rejected the Commission's preliminary objection that the taxpayer lacked standing to prosecute the matter. As the Supreme Court explained:

> *In re Biester* spoke principally to the importance of assuring that a government agency's actions not evade review for want of an aggrieved party under the limited terms of traditional standing. As noted, standing under *In re Biester* aims to "ensure . . . judicial review which would otherwise not occur," when "those directly and immediately affected by the complained of expenditures are beneficially affected as opposed to adversely affected." 409 A.2d at 852. There appears to be no one better situated than [the taxpayer] to challenge the non-enforcement asserted here. Moreover, we perceive no alternative means to invoke judicial review of the important question before us. Thus, we find no error in the Commonwealth Court's determination that [the taxpayer] had standing to bring the instant claim.

*Seeton*, 937 A.2d at 1033.

Thus, in *Consumer Party*, *Common Cause/Pennsylvania*, and *Seeton*, standing was granted to taxpayers to assert the claims raised therein because governmental action would likely evade review for want of an aggrieved party. Likewise, in the instant matter, the Amended Petition alleges that all of the named Respondents were involved in the budgetary process and its oversight and implementation underlying the constitutional and statutory claims raised by

---

[14] 34 Pa. C.S. §§101-2965.

13

Petitioners Brouillette and Lewis therein. As a result, none of the Respondents are inclined to challenge their own actions or inactions in this regard. Additionally, their actions or inactions would otherwise go unchallenged; redress through any other channels is unavailable; and no other persons are better situated to assert the claim than Petitioners Brouillette and Lewis as taxpayers.[15] Moreover, as outlined *infra*, judicial review of the state budgetary process for FY2016-17 and FY2017-18

[15] *See also Lawless v. Jubelirer*, 789 A.2d 820, 826-27 (Pa. Cmwlth.), *aff'd*, 811 A.2d 974 (Pa. 2002), wherein this Court observed:

> There is, however, a narrow exception to the general requirements of standing where a citizen may challenge an action that would otherwise go unchallenged in the courts. This legal precept is often applied where persons also assert standing on the basis that they are taxpayers and, thus, have an interest in the public fisc. . . .

> Examining the five-part test enunciated in *Consumer Party*, we conclude that petitioners do have standing. First, we believe that there is a real possibility that the issue called into question might otherwise go unchallenged. Respondent's colleagues in the Senate may not wish to raise the issue since those of his own party may benefit from his increased responsibilities and those of the other major party will have need to work with him in [] his capacities [as Lieutenant Governor, President *pro tempore* of the Senate, and Senator]. For similar reasons, those legislators directly and immediately affected by his concurrent occupation of the three positions may benefit more, both personally and politically, by not challenging his authority.

> Next, we believe that judicial relief is appropriate to challenge the constitutionality of this issue of first impression, challenging an individual's right to occupy the positions of Lieutenant Governor, President *pro tempore* of the Senate, and Senator simultaneously, and, if warranted, declare that a need for a special election is present. Additionally, redress is not available elsewhere, and no persons who are better situated to commence this lawsuit have even been suggested.

14

is eminently appropriate. Accordingly, we overrule Respondents' POs with respect to Petitioners Brouillette's and Lewis's standing to prosecute the instant Amended Petition. *Seeton*; *Consumer Party*; *In re Biester*; *Lawless*.

**B.**

In contrast, Petitioner Christiana is a representative in the Pennsylvania General Assembly, representing Beaver and Washington Counties. Amended Petition ¶11. Petitioner Christiana only joins in Count III of the Amended Petition alleging that the Governor, the Treasurer, the Auditor General, and the Commonwealth generally violated Article 8, Section 7 of the Pennsylvania Constitution, based on the purportedly illegal long-term borrowing, and Article 8, Section 12(a), based on the Governor's purported submission of an unbalanced operating budget to the General Assembly, with the assistance of the Treasurer and the Auditor General. Amended Petition ¶¶110-138. Petitioner Christiana asserts that he did not vote to authorize the assumption of such debt; the budget deficit purportedly usurps his authority to vote on whether such debt should be assumed; and he did not vote to use short-term borrowing to finance continued deficit spending. Amended Petition ¶¶131, 132, 135.

As the Supreme Court has explained:

> [L]egislative standing is appropriate only in limited circumstances. Standing exists only when a legislator's direct and substantial interest in his or her ability to participate in the voting process is negatively impacted, *see Wilt* [*v. Beal*, 363 A.2d 876 (Pa. Cmwlth. 1976)], or when he or she has suffered a concrete impairment or deprivation of an official power or authority to act as a legislator, *see Fumo* (finding standing due to alleged usurpation of legislators' authority to vote on licensing). These are injuries personal to the legislator, as a

15

legislator. By contrast, a legislator lacks standing where he or she has an indirect and less substantial interest in conduct outside the legislative forum which is unrelated to the voting or approval process, and akin to a general grievance about the correctness of governmental conduct, resulting in the standing requirement being unsatisfied. *Id.* (rejecting standing where legislators' interest was merely disagreement with way administrator interpreted or executed her duties, and did not interfere with legislators' authority as members of the General Assembly).

*Markham v. Wolf*, 136 A.3d 134, 145 (Pa. 2016).

Based on the foregoing, and the allegations raised in the Amended Petition, we hold that Petitioner Christiana has failed to demonstrate the requisite legislative standing to assert Count III of the Amended Petition. The crux of Petitioner Christiana's claims in Count III relate to the purported invalidity of the actions of the Governor, the Treasurer, the Auditor General, and the Commonwealth generally, and do not assert an injury that is personal to him while he was acting in his representative capacity as a legislator. As noted by the Supreme Court:

[T]hese claims of injury reflect no impact on [the Senate] Appellants' right to act as legislators, and are more, in our view, in the nature of a generalized grievance about the correctness of governmental conduct. Simply stated, the assertion that another branch of government—here, the executive branch through the Governor's Executive Order—is diluting the substance of a previously enacted statutory provision is not an injury which legislators, as legislators, have standing to pursue.

*Markham*, 136 A.3d at 145.

Moreover, as outlined above, Petitioners Brouillette and Lewis possess taxpayer standing to vindicate the purported harms alleged in Count III of the Amended Petition. *See Markham*, 136 A.3d at 146 ("[C]hallengers exist who

16

are, from a standing perspective, sufficiently impacted by the Governor's issuance of Executive Order 2015-05, as aptly demonstrated by the parties in this matter . . . ."). Accordingly, we sustain Respondents' POs with respect to Petitioner Christiana's standing, and dismiss him as a party to Count III of the Amended Petition. *Id.*

## II.

Additionally, as a preliminary matter, the Commonwealth has filed a PO that it was improperly joined as a party in this case. On review, it is clear that Petitioners Brouillette and Lewis have erroneously raised claims against the Commonwealth generally as a party in Counts II and III of the Amended Petition.

As the Pennsylvania Supreme Court has explained:

> The Constitution of Pennsylvania provides that the commonwealth and its agents may only be sued in the manner, in the courts, and in cases specified by the General Assembly. Pa. Const. art. 1[,] §11. The General Assembly has specified that the Commonwealth and its agents remain immune from suit except when immunity is specifically waived. 42 Pa. C.S. §8522. "When the General Assembly specifically waives sovereign immunity, a claim against the Commonwealth and its officials . . . shall be brought only [as provided by] Title 42 . . . unless otherwise specifically authorized by statute." 1 Pa. C.S. §2310. The General Assembly has waived sovereign immunity for Commonwealth parties in limited cases. 42 Pa. C.S. §8522. The General Assembly has defined a Commonwealth party as a "Commonwealth agency and any employee thereof, but only with respect to an act within the scope of his office or employment." 42 Pa. C.S. §8501.

> This Court has further determined that sovereign immunity does not apply to "governmental entities other than the commonwealth itself," and that government

17

entities may not avoid suit simply due to their governmental nature. *Specter v. Commonwealth*, [341 A.2d 481, 482 (Pa. 1975)]. Implicit in this premise is the distinction between the Commonwealth and its numerous subdivisions. Appellees in this case have named the Commonwealth, to which the legislature has not waived sovereign immunity, and have failed to name an appropriate Commonwealth party as to which immunity has been waived. Amending their complaint to substitute a Commonwealth party for the Commonwealth amounts to the addition of a new party and not merely the correction of a captioned party name.

*Tork-Hiis v. Commonwealth*, 735 A.2d 1256, 1258 (Pa. 1999).

To this end, Pa. R.C.P. No. 2102(a)(2) provides that, while "[a]n action by the Commonwealth" may be brought in the name of "the Commonwealth of Pennsylvania," an action against a "Commonwealth agency or party" generally may not. Citing Article 1, Section 11 of the Pennsylvania Constitution and 1 Pa. C.S. §2310, the Official Note to Pa. R.C.P. No. 2102 recognizes that there is "only" one exception: Where there is a cause of action against the Commonwealth generally and an express "right of action [against the Commonwealth generally] has been authorized by statute." *See also Finn v. Rendell*, 990 A.2d 100, 105 (Pa. Cmwlth. 2010) ("The Court also notes that the Commonwealth government and its various agencies and officers are separate entities and that 'the Commonwealth of Pennsylvania, itself, which is clearly **not** a **Commonwealth agency**, still enjoys absolute immunity pursuant to 1 Pa. C.S. §2310.'") (citation omitted and emphasis in original).

As a result, Petitioners Brouillette and Lewis improperly joined the Commonwealth generally as a respondent in the instant matter.[16] Accordingly, we

---

[16] Petitioners' reliance on *League of Women Voters v. Commonwealth*, 178 A.3d 737 (Pa. 2018), *Pennsylvania State Association of County Commissioners v. Commonwealth*, 52 A.3d **(Footnote continued on next page…)**

sustain Respondents' POs with respect to the improper joinder of the Commonwealth generally, and dismiss it as a party to Counts II and III of the Amended Petition.

---

**(continued…)**

1213 (Pa. 2012), and *Stilp v. Commonwealth*, 974 A.2d 491 (Pa. 2009), to support the Commonwealth's status as a party herein is misplaced. None of these cases involved the consideration or disposition of a preliminary objection alleging the misjoinder of the Commonwealth generally as a party, its absolute immunity, or the application of Article 1, Section 11 of the Pennsylvania Constitution, 1 Pa. C.S. §2310, or Pa. R.C.P. No. 2102. Additionally, in *Finn*, cited above, the petitioners sought relief in the form of a writ of mandamus to compel reimbursement for the salary paid to its full-time district attorney during a two-year period, and did not assert a claim for monetary damages. *See id.* at 102. As this Court explained:

> Even assuming, *arguendo*, that in theory sovereign immunity would not bar mandamus, the nature of the Commonwealth as an entity separate from its agencies and officers makes any such action a practical impossibility. The Commonwealth comprises three branches of government, each divided into many independent subparts. . . . A request that the Commonwealth be ordered to do something begs the question which of the many actors comprising state government is to be held accountable. Since merely naming the Commonwealth is insufficient to state a claim against a Commonwealth party, *Tork–Hiis*, it would seem self-evident that if a specific state party can be identified as having a mandatory or ministerial duty, that party must be the named defendant, both in order to make out a cause of action in mandamus and to effectuate enforcement of any ensuing order.

*Id.* at 105-06. Likewise, in the instant matter, any meaningful declaratory relief that this Court could provide must be directed to the actions of some identifiable Commonwealth party that violated some identifiable constitutional or statutory provision rather than to the Commonwealth generally.

**III.**

With respect to the purported violations of Article 8, Section 12(a) of the Pennsylvania Constitution and Sections 613(1) and 701(g) of the Administrative Code as asserted in Counts I, II, and III of the Amended Petition, the Governor and the Treasurer demur,[17] in relevant part, on the basis that Petitioners Brouillette and Lewis fail to state a valid claim for declaratory relief. We agree.

Petitions for declaratory judgments are governed by the provisions of the Declaratory Judgments Act, 42 Pa. C.S. §§7531-7541. *Ronald H. Clark, Inc. v. Township of Hamilton*, 562 A.2d 965, 967 (Pa. Cmwlth. 1989). Although the Declaratory Judgments Act is to be liberally construed, one limitation on a court's ability to issue a declaratory judgment is that the issues involved must be ripe for judicial determination, meaning that there must be the presence of an actual case or controversy. *Ruszin v. Department of Labor and Industry*, 675 A.2d 366, 371 (Pa. Cmwlth. 1996). Thus, the Declaratory Judgments Act requires a petition praying for declaratory relief to state an actual controversy between the petitioner and the named respondent. *Pennsylvania State Lodge v. Department of Labor and Industry*, 692 A.2d 609, 613 (Pa. Cmwlth. 1997), *aff'd*, 707 A.2d 1129 (Pa. 1998).

Declaratory judgments are not obtainable as a matter of right. *Ronald H. Clark, Inc.*, 562 A.2d at 968-69. Rather, whether a court should exercise jurisdiction over a declaratory judgment proceeding is a matter of sound judicial discretion. *Id.* Thus, the granting of a petition for a declaratory judgment is a matter lying within the sound discretion of a court of original jurisdiction. *Gulnac*

---

[17] As noted above, the Auditor General did not preliminarily object, but instead filed an answer to the Amended Petition and a notice of non-participation in these proceedings.

*v. South Butler School District*, 587 A.2d 699, 701 (Pa. 1991). As the Pennsylvania Supreme Court has stated:

> The presence of antagonistic claims indicating imminent and inevitable litigation coupled with a clear manifestation that the declaration sought will be of practical help in ending the controversy are essential to the granting of relief by way of declaratory judgment. . . .
>
> Only where there is a real controversy may a party obtain a declaratory judgment.
>
> A declaratory judgment must not be employed to determine rights in anticipation of events which may never occur or for consideration of moot cases or as a medium for the rendition of an advisory opinion which may prove to be purely academic.

*Id.* at 701 (citations omitted)

The Amended Petition summarizes the relevant stages of the budget process as follows. Preparation for the annual budget "begins in approximately August of the prior fiscal year for which the [b]udget will be adopted," and the Office of the Budget (Budget Office) issues Budget Instructions to "administrative agencies, which are instructions that provide the agencies with detailed guidance in constructing their budget requests." Amended Petition ¶¶23, 24.[18] The Governor

---

[18] Section 609(a) of the Administrative Code provides, in pertinent part:

> (a) The [Budget Office] is hereby established as an administrative agency within the Governor's Office[, which] shall continue to exercise the powers and perform the duties vested in and imposed upon the Secretary of the Budget [(Secretary)] and shall be centrally concerned with the development of the budget request of the Governor and with the decisions necessary to allocate revenues among the various Commonwealth programs.

71 P.S. §229(a).
**(Footnote continued on next page…)**

In turn, Section 610, states, in relevant part:

(a) The [Secretary] shall, in each year obtain and prepare financial and program information necessary for the preparation of a State budget for the budget year beginning July 1 and for the preparation for financial and program projections for the budget year and for four succeeding years. He shall, not later than August 15 of such year distribute to the Governor, to the Lieutenant Governor, to the Auditor General, to the State Treasurer, to the Attorney General, to each administrative department, to each independent administrative board and commission, to the Chief Clerk of the Senate, to the Chief Clerk of the House of Representatives, to the State court administrator, and to all institutions or other agencies which desire State appropriations to be made to them, the proper instructions and blanks necessary to the preparation of the budget requests with a notice that such blanks shall be returned with the information desired, not later than November 1 of the same year. Such blanks shall be in such form as shall be prescribed by the [S]ecretary, to procure any or all information pertaining to the purposes of all programs to be funded in the budget, the revenues, expenditures, program activities and accomplishments for the preceding fiscal year, for the current fiscal year, and for the budget year and for four succeeding years, the appropriations made for the preceding fiscal year, the expenditures therefrom, encumbrances thereon, the amount unencumbered and unexpended, an itemized estimate of the revenues and expenditures of the current fiscal year, for the budget year and succeeding years, and an estimate of the revenue amounts needed and program activity and accomplishment levels for the respective departments, boards, commissions, for expenses of the General Assembly, for the Judicial Department, and for any and all institutions, or other agencies to which appropriations are likely to be made by the General Assembly for the budget year and ensuing years. . . . It shall be the duty of each administrative department, and each independent administrative board and commission to comply, not later than November 1, with any and all requests made by the [Secretary] in connection with the budget.

**(Footnote continued on next page…)**

22

also issues Program Policy Guidelines to administrative agencies to aid in formulating the proposed budget. *Id.* ¶25. From October to January, the Budget Office reviews the agencies' budget requests to see if they comply with the Program Policy Guidelines and, following review, the Budget Office makes recommendations to the Secretary and the Governor. *Id.* ¶¶27-29, 33. "[B]y statute and in accordance with the . . . Constitution's balanced budget requirement, the combined total of all agency requests *must balance* with the estimated total revenues from existing sources; otherwise, new revenue sources must be recommended." *Id.* ¶30 (emphasis in original). Based on the recommendations and his independent review, the Governor formulates the Executive Budget in January and submits the proposed budget to a joint session of the General Assembly in a budget address in February. *Id.* ¶¶34-35. Article 8, Section 12(a) and Sections 613 and 701(g) require the Governor to submit a balanced budget that sets forth in detail proposed expenditures by department, agency, or program, and

---

**(continued…)**

> (b) The [Secretary] may, under the direction of the Governor, make further inquiries and investigations as to the financial needs, expenditures, estimates of levels of program activities and accomplishments, or revenues, of any department, board, commission, authority, political subdivision, institution or other agency receiving money from the State Treasury. The Governor may, after giving to each department, board or commission an opportunity to be heard, approve, disapprove or alter the budget requests. The [Secretary] shall, on or before January 1 next succeeding, submit to the Governor, in writing, the above information, and any additional requested by the Governor, as the basis for the Governor's requests for appropriations for the next succeeding year.

71 P.S. §230.

estimated revenues from all sources, and require the Governor to recommend additional sources of revenue if estimated revenue and available surplus are less than the proposed expenditures. *Id.* ¶31-32.

Once submitted by the Governor, "the appropriations committees in both the Pennsylvania House and the Pennsylvania Senate conduct hearings to assess all funding requests made by administrative agencies." Amended Petition ¶36. The General Assembly must then draft and enact a General Appropriations Bill, "which contains appropriations for the executive, legislative, and judicial departments; for public schools; and for public debt." *Id.* ¶38. Article 8, Section 13 requires the General Assembly to adopt such a budget, and appropriations for the operating budget "shall not exceed the actual and estimated revenues and surplus available in the same fiscal year," unless revenue measures are enacted if necessary to balance the budget. *Id.* ¶¶37, 42, 43.

In attempting to invoke actionable violations of Article 8, Section 12(a) of the Pennsylvania Constitution[19] and Sections 613(1) and 701(g) of the

---

[19] Petitioners Brouillette and Lewis implicate the Treasurer and the Auditor General in the purported constitutional violation, in relevant part, as follows:

> [Article 8, Section 12(a)] clearly and unequivocally places the onus to present a balanced budget on the Governor. The Governor, however, does not control the public moneys that make up the treasury. The Treasurer and the Treasury Department are entrusted with responsibility for the Commonwealth's funds. *See* [Sections 301 through 303 of the Fiscal Code, Act of April 29, 1929, P.L. 343, *as amended*,] 72 P.S. §§301-03. Without the assistance of the Treasurer, the Governor is incapable of managing the treasury to meet his constitutional mandate. Conversely, absent the Treasurer's complicity, the Governor would be unable to borrow the funds that permitted Pennsylvania's budget to be unbalanced for two consecutive fiscal years as Article [8], Section 12 only allows the Governor, Auditor General and Treasurer,

**(Footnote continued on next page…)**

Administrative Code, Petitioners Brouillette and Lewis fail to allege or demonstrate the necessary connection between the Governor's proposed Executive Budget that was submitted to the General Assembly pursuant to the foregoing provisions, and the ultimate General Appropriations Bills that were enacted by that body for FY2016-17 and FY2017-18 or any purported debt incurred thereunder.

To this end, Petitioners Brouillette and Lewis assert that "[t]he General Appropriations Bill reflects the priorities mutually established by the Governor and the General Assembly through the budgeting process." Amended Petition ¶39. Petitioners further contend that the Governor "violated Article [8], Section 12 . . . by allowing a $31.38 billion General Appropriations Bill to become law without sufficient revenue sources to fund each appropriation included in the Bill." *Id.* ¶95. However, these are incorrect legal conclusions that may not be drawn from the budget process as outlined in the Amended Petition.

Indeed, as the Pennsylvania Supreme Court has explained:

> Under Article II, Section 1 of our Constitution, the legislative power of the Commonwealth is vested in the General Assembly. PA. CONST. art. II, §1. The legislative power is the power "to make, alter and repeal laws." *Blackwell v. State Ethics Comm'n*, [567 A.2d 630, 636 (Pa. 1989)] (quoting *Mount Lebanon v. County Bd. of Elections*, [368 A.2d 648 (Pa. 1977)]; *In re Marshall*, [69 A.2d 619, 626 (Pa. 1949)]). Article IV,

---

**(continued…)**

> **acting jointly**, to incur debt. Accordingly, the violation of Article [8], Section 12 that gives rise to this action could not have occurred without the active participation of the Treasurer.

Petitioners' Omnibus Brief in Opposition to the Preliminary Objections at 47-48 (emphasis in original).

Section 2 vests "[t]he supreme executive power" in the Governor, who "shall take care that the laws be faithfully executed." PA. CONST. art. IV, §2. The Governor's powers include his power to veto legislation to the extent that this power is vested in him by Sections 15 and 16 of Article IV. The Governor's exercise of his veto power is unique in that it is essentially a limited legislative power, particularly in the appropriations context. *Roddey v. County Council of County of Allegheny*, 841 A.2d 1087, 1091 (Pa. Cmwlth. 2004) (en banc). Although the Constitution directs the Governor each year to "submit" a budget to the General Assembly, PA. CONST. art. VIII, §12, appropriations are to be "made by the General Assembly," PA. CONST. art. VIII, §13, and "[n]o money shall be paid out of the treasury, except on appropriations made by law," PA. CONST. art. III, §24. ***So long as the General Assembly keeps the budget submitted by the Governor balanced***, *see* PA. CONST. art. VIII, §13(a), ***the Constitution allows the General Assembly to deviate as much as it wishes from the Governor's proposals.*** "[T]he General Assembly enacts the legislation establishing those programs which the state provides for its citizens and appropriates the funds necessary for their operation[] [while] [t]he executive branch implements the legislation by administering the programs." *Shapp v. Sloan*, [391 A.2d 595, 604 (Pa. 1978)] (plurality opinion). This process is "fundamental within Pennsylvania's tripartite system." *Id.*

In administering the programs funded by the General Assembly, the executive branch must abide by all requirements and restrictions of the relevant legislation and may not spend more than the amount appropriated by the General Assembly. *Id.* Moreover, "[t]he executive branch may not of its own initiative use funds appropriated for one program in carrying out another and may not spend on a program more than its designated amount. It is in this way that the doctrine of separation of powers functions." *Id.*

*Jubelirer v. Rendell*, 953 A.2d 514, 529-30 (Pa. 2008) (emphasis added).

The disconnect between the Governor's exercise of his authority under Article 8, Section 12(a) of the Pennsylvania Constitution and Sections 613(1) and 701(g) of the Administrative Code, and the General Assembly's enactment of General Appropriations Bills for FY2016-17 and FY2017-18, is evidenced by the declaratory relief sought by Petitioners Brouillette and Lewis in the Amended Petition. As indicated above, in Count I, these Petitioners seek a declaration that the Governor violated Article 4, Sections 15 and 16 of the Pennsylvania Constitution and Section 618 of the Administrative Code "by authorizing the Commonwealth to appropriate and spend funds that exceeded actual and estimated revenues." Amended Petition at 27.

Additionally, in Count II, they seek a declaration that the Governor, Senate Respondents, House Respondents, and the Commonwealth generally violated Article 8, Section 13 of the Pennsylvania Constitution because "the Commonwealth ended [FY2016-17] with a $1.55 billion deficit," and "the General Appropriations Bill for [FY2017-18] violates [Article 8, Section 13] because, at the time of enactment, appropriations contained therein 'exceed[ed] the actual and estimated revenues and surplus available in the same fiscal year[]' by $600 million." Amended Petition at 29.

Finally, in Count III, they seek a declaration that the Governor, the Treasurer, the Auditor General, and the Commonwealth generally violated Article 8, Sections 7 and 12 of the Pennsylvania Constitution "by authorizing lines of credit to fund a $1.55 billion deficit accrued in [FY2016-17] . . . that spanned across multiple fiscal years," and "[t]hat the General Appropriations Bill for [FY2016-17] violated the Pennsylvania Constitution by appropriating funds in

27

excess of anticipated revenues, thereby saddling the Commonwealth with a debt of $1.55 billion without the explicit approval of the General Assembly." *Id.* at 36.

As outlined above, Petitioners Brouillette and Lewis have failed to allege an actionable claim regarding the Governor's purported violations of Article 8, Section 12(a) of the Pennsylvania Constitution and Sections 613(1) and 701(g) of the Administrative Code, as asserted in Counts I, II, and III of the Amended Petition, or actionable claims against the Treasurer and Auditor General as well, and have failed to request any declaratory relief based on these purported violations. The Amended Petition simply fails to allege or demonstrate that the Governor's proposed Executive Budget that was submitted to the General Assembly pursuant to the foregoing provisions for FY2016-17 and FY2017-18 was the same as the purportedly unbalanced General Appropriations Bills that were enacted by the General Assembly for those fiscal years, or that the Treasurer or Auditor General played any role in the actions enumerated in these provisions.

Moreover, these Petitioners do not ask for any relief with respect to the Governor's, the Treasurer's, or the Auditor General's purported violation of these provisions. Thus, any order issued by this Court granting declaratory relief based on the purported violation of Article 8, Section 12(a) of the Pennsylvania Constitution and Sections 613(1) and 701(g) of the Administrative Code would be merely advisory. Accordingly, the POs in the nature of a demurrer with respect to these claims in Counts I, II, and III of the Amended Petition are sustained, and these claims are dismissed.

28

**IV.**

With respect to the Governor's purported violation of Article 4, Sections 15 and 16 of the Pennsylvania Constitution and Section 618(a) of the Administrative Code, as alleged in Counts I and II, the Governor demurs, in relevant part, on the basis that Petitioners Brouillette and Lewis fail to state a valid claim for declaratory relief. Again, we agree.

The Pennsylvania Supreme Court has summarized the Governor's general veto power under Article 4, Section 15, as follows:

> By conferring upon the Governor the authority to nullify legislation that has passed both legislative houses, Section 15 entrusts him with the obligation both to examine the provisions of the legislation within the ten days allotted by Section 15 and to either approve it or return it, disapproved, for legislative reconsideration. Disapproval requires the Governor to furnish the legislature with his specific objections in order to enable the legislature to fulfill its reciprocal obligations to record the Governor's objections upon the legislative journal and reconsider the bill. This procedure is enshrined in our organic charter, and ensures that the legislature and the public receive notice of the Governor's veto and the resulting status of the legislation. The Governor is thereby an "integral part of the lawmaking power of the state." No bill may become law without first being submitted to the Governor for approval or disapproval. Although legislative power is vested in the General Assembly pursuant to Article II of the Constitution, we have described the Governor's authority to veto a bill as a form of "limited legislative power."

> The Pennsylvania colony inherited the Governor's veto power from the King of England. Notably, the monarch's frequent use of this lawmaking authority, which was vested in him as a "constituent if not a controlling third body of the parliament, in which he

29

might and not infrequently did sit in person," was set forth as first among the grievances of the colonies in the Declaration of Independence. From the colonies, the veto power passed into nearly all of the American constitutions, state and federal. However, "[u]nlike the royal prerogative," the executive veto is "exercised by a democratically elected leader pursuant to a clearly defined constitutional procedure." ***Moreover, in Pennsylvania, the Governor's veto power is more constrained than that enjoyed by a number of his peers or by the President of the United States, in that the Governor does not have the luxury of inaction. That is, if Pennsylvania's Governor fails to act upon a bill that has been passed in both houses, the bill becomes law without his signature.*** The "pocket veto" enshrined in some state constitutions and in the United States Constitution prevents a bill from becoming law if the legislature "stands adjourned when the President's consideration period comes to a close.[20]

---

[20] The process by which a federal bill is enacted into law has been outlined as follows:

The [United States] Constitution contemplates that every bill shall receive the consideration of three deliberative parties before it becomes law. After each House of Congress approves a bill, it must be presented to the President. If the President signs the bill, it is law. A bill may become law without the President's approval, but only under two circumstances. If the President vetoes the bill, two-thirds of each house may override his objection and make the bill law. Alternatively, if the President simply does not act on the measure within ten days after presentment, excluding Sundays, and Congress does not adjourn before the ten-day period ends, the bill becomes law without the President's approval. [*See* Clause 2 of Article 1, Section 7 of the United States Constitution, U.S. Const. art. I, §7, cl. 2 ("If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a Law, in like Manner as if he had signed it, unless the Congress by their Adjournment prevent its Return, in which Case it shall not be a Law.").]

**(Footnote continued on next page…)**

*Scarnati v. Wolf*, 173 A.3d 1110, 1120-21 (Pa. 2017) (citations and footnote omitted and emphasis added). *See also Commonwealth ex rel. Attorney General v. Barnett*, 48 A. 976 (Pa. 1901), in which the Supreme Court stated:

> "The power to veto legislation which is conferred upon the president makes him in effect a third branch of the legislature. The power is legislative, executive and the questions presented to his mind are precisely the same as those the two houses of congress must determine in passing a bill. Whether the proposed law is necessary or expedient, whether it is constitutional, whether it is so framed as to accomplish its intent, and so on, are questions transferred from the two houses to the president with the bill itself."

*Id.* (citation omitted).

Whether the Governor's veto power is considered to be the exercise of either a legislative[21] or executive power,[22] in the instant matter we are confronted

---

**(continued…)**

> If Congress stands adjourned when the President's consideration period comes to a close, the bill "shall not be a Law." [*See id*.] This passive nullification of a legislative act is called a pocket veto. Unlike its counterpart the return veto, the pocket veto does not impose a duty on the President to return the bill to Congress with his objections. Moreover, Congress does not reconsider a pocket vetoed bill in the same manner as it would a return vetoed bill. A bill that is pocket vetoed may be reintroduced and passed by a simple majority, in contrast to the two-thirds requirement that applies when a return veto is subject to reconsideration.

John Houston Pope, *The Pocket Veto Reconsidered*, 72 Iowa L. Rev. 163-64 (1986) (footnotes omitted).

[21] *See* Article 2, Section 1 of the Pennsylvania Constitution, Pa. Const. art. II, §1 ("The legislative power of this Commonwealth shall be vested in a General Assembly, which shall consist of a Senate and a House of Representatives.").

31

with the situation in which the General Appropriations Bill for the FY2017-18 budget became law pursuant to Article 4, Section 15 of our Constitution based upon his failure to exercise either power with respect to its enactment. Indeed, as outlined above, Article 4, Section 15 provides, in relevant part, "If any bill shall not be returned by the Governor within ten days after it shall have been presented to him, the same shall be a law in like manner as if he had signed it[.]" Pa. Const. art. IV, §15.

As a result, we are unable to grant the requested declaratory relief because the Governor in no way "violated the Pennsylvania Constitution . . . by authorizing the Commonwealth to appropriate and spend funds that exceeded actual and estimated revenues." Amended Petition at 27.[23] To the contrary, the

---

**(continued…)**

[22] *See* Article 4, Section 2 of the Pennsylvania Constitution, Pa. Const. art. IV, §2 ("The supreme executive power shall be vested in the Governor, who shall take care that the laws be faithfully executed[.]").

[23] *See* Amended Petition ¶76 ("Governor Wolf had the authority and the obligation to take corrective action *before* he allowed the $32 billion appropriations package to become law.") (emphasis in original); *id.* ¶77 ("When the $31.38 billion General Appropriations Bill was presented to him, Governor Wolf had both the authority and the duty to (i) veto the Bill entirely or (ii) use the item veto to reduce appropriations to a level commensurate with actual and estimated revenues."); *id.* ¶95 ("Specifically, Governor Wolf violated . . . Article IV, Section 16, by allowing a $31.38 billion General Appropriations Bill to become law without sufficient revenue sources to fund each appropriation included in the Bill."); *id.* ¶98 ("Governor Wolf allowed the $31.38 billion General Appropriations Bill to become law without adequate revenues to fund it."); Petitioners' Omnibus Brief in Opposition to the Preliminary Objections at 52 ("Despite Governor Wolf's argument, Petitioners' claims do not challenge the Governor's discretionary authority to use his veto power. The relief sought does not seek to compel Governor Wolf to take any action. Rather, it merely asks this Court to determine whether the Governor's competing constitutional obligations require him to employ his veto power to prevent the enactment of an unconstitutional balanced budget."); *id.* at 53-54 ("The Amended Petition [] does not ask this Court to compel the Governor to take any specific actions, which is a **(Footnote continued on next page…)**

Governor "authorized" nothing with respect to the General Appropriations Bill for the FY2017-18 budget; the bill became law by operation of law pursuant to Article 4, Section 15 of the Pennsylvania Constitution based on the Governor's inaction within the enumerated period of time. There is no language within this constitutional provision that requires the Governor to exercise this power in any particular manner[24] including a duty to determine the constitutionality of a bill with which he is presented that has been duly enacted by the General Assembly or compelling him to exercise his veto authority due to the purported unconstitutionality of that bill. This Court has explained:

> As the Governor notes, [the petitioner] has pleaded only that [he] is the Governor and in that capacity he signed Senate Bill 850 into law without first inquiring whether the Complex was protected by a public trust or seeking an opinion of the Attorney General regarding the constitutionality of Senate Bill 850. These factual averments are simply insufficient to establish any liability on the part of the Governor, and [the petitioner] has cited to no legal authority for the proposition that a governor has a duty to make such inquiries before signing legislation.

*Pilchesky v. Rendell*, 932 A.2d 287, 289 (Pa. Cmwlth. 2007). Thus, the only limitation within this constitutional provision is the time period within which the

_____

**(continued…)**

prerequisite for mandamus relief. . . . Petitioners only request this Court to define and interpret the Governor's constitutional and statutory obligations in light of the balanced budget mandate.") (emphasis in original).

    [24] *See, e.g.*, *Stilp*, 974 A.2d at 495 ("[A] constitutional provision is to be interpreted insofar as possible in terms of its spirit and intention. Furthermore, such a provision is to be interpreted in its popular sense as understood by the people who adopted it. The 'ultimate touchstone, nevertheless, must remain the language of the Constitution itself.'") (citations omitted).

Governor may exercise the power conferred thereby. Moreover, the same rationale holds true for Petitioners' claims with respect to the Governor's failure to exercise his item veto power under Article 4, Section 16. *See Jubelirer*, 953 A.2d at 528 ("[W]here two provisions of our Constitution relate to the same subject matter, they are to be read *in pari materia*.") (citations omitted).

Finally, regarding the purported violation of Section 618(a) of the Administrative Code, as stated above, that provision states, in relevant part:

> (a) The Department of Revenue in conjunction with the Secretary of the Budget shall make revenue estimates for the use of the Governor in preparing the budget with periodic revisions *until the final estimate is signed by the Governor not later than the time he signs the general appropriations bill*. . . . The Governor shall item veto any part of any appropriation bill that causes total appropriations to *exceed the official estimate plus any unappropriated surplus.*

71 P.S. §238(a) (emphasis added).

However, the Amended Petition fails to allege that the Governor signed either the final estimate provided by the Department of Revenue and the Secretary for the FY2017-18 budget, or that he signed the General Appropriations Bill for that fiscal year. As a result, contrary to Petitioners' assertion, the express provisions of Section 618(a) are not implicated in this case and Petitioners' claim to the contrary is likewise without merit. Accordingly, the POs in the nature of a demurrer with respect to the claims in Counts I and II that the Governor violated Article 4, Sections 15 and 16 of the Pennsylvania Constitution and Section 618(a) of the Administrative Code are sustained, and these claims are dismissed.

34

## V.

With respect to the General Assembly's and the House and Senate Respondents' purported violation of Article 8, Section 13 of the Pennsylvania Constitution, the Amended Petition alleges, in relevant part, that spending in the General Appropriations Bill for FY2016-17 enacted by the General Assembly, and approved by the Governor, exceeded actual revenues resulting in a deficit of $1.55 billion. Amended Petition ¶¶50, 51. During FY2016-17, the Commonwealth borrowed $2.5 billion on a line of credit from the Treasury, using $400 million in August of 2016 and $1.2 billion in September of 2016. *Id.* ¶52. On June 30, 2017, the General Assembly enacted a $31.38 billion General Appropriations Bill for FY2017-18. *Id.* ¶57. Because expenditures exceeded actual and estimated revenues, subsequent legislation was enacted that purportedly supplied additional revenue sources to balance the FY2017-18 budget, such as the Act of October 30, 2017, P.L. 419 (Act 42 of 2017); the Act of October 30, 2017, P.L. 672 (Act 43 of 2017); and the Act of October 30, 2017, P.L. 725 (Act 44 of 2017). *Id.* ¶58. *See also* Act of October 30, 2017, P.L. 379 (Act 40 of 2017).[25] As a result, for the period of four months between the enactment of the General Appropriations Bill for FY2017-18 and the enactment of the subsequent legislation in October of 2017, expenditures exceeded actual and estimated revenues rendering the Commonwealth's budget out of balance in violation of, *inter alia*, Article 8, Section 13 of the Pennsylvania Constitution. *Id.* ¶¶59, 61.

However, as indicated above, Senate Respondents have filed another Application to Dismiss for Mootness, limiting the relief sought to dismissal of

---

[25] It is well settled that this Court will take judicial notice of public statutes. *In re Annual Controller's Reports for Years 1932, 1933, 1934, 1935 and 1936*, 5 A.2d 201, 204 (Pa. 1939).

Count II of the Amended Petition rather than outright dismissal of the entire Amended Petition as in the earlier joint motion to dismiss. Senate Respondents note that "the relief Petitioners seek in Count II – as framed in their own Amended PFR – is directed exclusively at the 2016 Budget and the 2017 Budget, both of which are now legally and practically inoperative," so that "'there is nothing for the Court to remedy' and no meaningful relief is possible as to Count II[.]" Application ¶¶20, 21.

Moreover, Senate Respondents contend, our December 2017 Memorandum Opinion denying the prior joint motion to dismiss is not controlling because our holding therein "is necessarily limited to Count III of the Amended [Petition]," and that "Count II and Count III cannot be analyzed coextensively, as the two claims are substantively distinct." Application ¶¶28, 29.[26] With respect to any factual disputes[27] as to whether or not the then effective General Operating

---

[26] In our prior Memorandum Opinion, we explained:

> [A]lthough Respondents argue the Amended Petition for Review in its entirety is moot based upon the passage of subsequent legislation that purports to balance the budget, they do not explain how this legislation renders moot the claim that they allegedly have engaged in long-term borrowing in violation of Article [8], Section 7. While Respondents do argue that any borrowing that has occurred does not violate the Constitution, and dispute Petitioners' interpretation of the constitutional provisions, such is not a basis for concluding this claim is moot.

*Brouillette*, slip op. at 10. Moreover, the substantive claims raised in Count III of the Amended Petition regarding the purported violation of Article 8, Section 7 of the Pennsylvania Constitution are addressed on the merits *infra*.

[27] *See Brouillette*, slip op. at 10 ("[T]here are factual matters in dispute, including whether or not the General Fund Balance is currently balanced. . . . This Court realizes that **(Footnote continued on next page…)**

Fund Budget was, in fact, balanced, Senate Respondents claim that "since the 2017 Budget no longer has any legal or practical effect, whatever factual dispute may have arguably existed with regard to it is now of no moment," and, "[a]ccordingly, the December [2017] Memorandum [Opinion] does not affect the present analysis." *Id.* ¶¶34, 35. We agree.

> As this Court has stated:
>
>> Under the mootness doctrine, "an actual case or controversy must be extant at all stages of review, not merely at the time the complaint is filed." The existence of a case or controversy requires "a real and not a hypothetical legal controversy and one that affects another in a concrete manner so as to provide a factual predicate for reasoned adjudication. . . ." As the Pennsylvania Supreme Court explained:
>>
>>> The cases presenting mootness problems involve litigants who clearly had standing to sue at the outset of the litigation. The problems arise from events occurring after the lawsuit has gotten under way—changes in the facts or in the law—which allegedly deprive the litigant of the necessary stake in the outcome.
>>
>> Pa. R.A.P. 1972[(a)](4) permits a party to move for dismissal for mootness during litigation. It is well settled that the courts "do not render decisions in the abstract or offer purely advisory opinions." Judicial intervention "is appropriate only where the underlying controversy is real and concrete, rather than abstract."
>>
>> Finally, it must be noted that "[c]onstitutional questions are not to be dealt with abstractly." Therefore,

_____

**(continued…)**

Respondents dispute facts alleged by Petitioners, but those disputes are not properly before this Court now, and do not provide a basis for concluding that the claims are moot.").

the court should be even more reluctant to decide moot questions which raise constitutional issues. The court "prefer[s] to apply the well-settled principles that [it] should not decide a constitutional question unless absolutely required to do so."

*Harris*, 982 A.2d a 1035 (citations omitted). *See also Mistich v. Pennsylvania Board of Probation and Parole*, 863 A.2d 116, 121 (Pa. Cmwlth. 2004) ("'[M]ootness, however it may have come about simply deprives us of our power to act; there is nothing for us to remedy, even if we were disposed to do so. We are not in the business of pronouncing that past actions which have no demonstrable continuing effect were right or wrong.'") (citation omitted).

The Amended Petition in the case *sub judice* asks this Court to enter declaratory judgment "That the General Appropriations Bill for FY2016-[17] violated the requirements set forth in Article [8], Section 13 . . . as the Commonwealth ended FY2016-[17] with a $1.55 billion deficit," and "That the General Appropriations Bill for FY2017-[18] violates the requirements set forth in Article [8], Section 13 . . . because, at the time of enactment, appropriations contained therein 'exceed[ed] the actual and estimated revenues and surplus available in the same fiscal year[]' by $600 million." Amended Petition at 29.

Because the foregoing requested relief would be of no demonstrable or appreciable effect due to the expiration of the relevant fiscal years; the subsequent enactment of remedial legislation; the subsequent enactment of a General Appropriations Bill for FY2018-19; the introduction of General Appropriation Bills relating to FY2019-20; and the absence of any allegations that the present or future General Appropriations Bills are affected in any manner by those at issue or suffer the same purported constitutional infirmities; we conclude

that the constitutional claims raised in Count II of the Amended Petition should be dismissed as moot as an appropriate exercise of judicial restraint.

Indeed, as the Pennsylvania Supreme Court has explained:

[A] legal question can become moot on appeal as a result of an intervening change in the facts of the case. For example in *Meyer v. Strouse*, [221 A.2d 191 (Pa. 1966)] involving an action in quo warranto, the appellant appealed from the lower court's judgment which ordered his ouster from the office of tax collector. Then the appeal reached this Court, the appellant's term of office had already expired, and this Court held that the intervening expiration of the appellant's term of office rendered the appeal moot. *Id.* . . .

Similarly, an issue can become moot due to an intervening change in the applicable law. In *Conti v. Pa. Dep't. of Labor & Industry*, [175 A.2d 56 (Pa. 1961)], this Court held an appeal to be moot where the question involved the validity of a minimum wage order executed by the Secretary of Labor and Industry based upon the then existing statutory authority and thereafter, during the pendency of the action, the General Assembly enacted the Minimum Wage Act of 1961, P.L. 1313. . . .

*See* [*also*] *Salisbury Twp. v. Sun Oil Co.*, [179 A.2d 195 (Pa. 1962)] (challenge to ordinance held moot on appeal due to expiration of ordinance); *N. Pa. Pwr. Co. v. Pa. P.U.C.*, [5 A.2d 133 (Pa. 1939), *overruled on other grounds*, *York v. Pa. P.U.C.*, 295 A.2d 825 (Pa. 1972)] (constitutional challenge to statute held moot on appeal due to intervening amendment enacted by legislature)[.]

This Court is even more reluctant to decide moot questions which raise constitutional issues. *Wortex Mills v. Textile Workers*, [85 A.2d 851 (Pa. 1952)]. In *Wortex Mills* this Court was asked to decide, as a constitutional matter, whether peaceful, organizational labor union picketing was legal; in *Wortex Mills* the strike which caused the picketing had ended by the time the appeal

39

reached this Court. In declining to reach the constitutional question, this Court observed:

> "'Constitutional questions are not to be dealt with abstractly.'"

> *Id.* at [857], *quoting*, *Bandini Petroleum Co. v. Superior Ct.*, 284 U.S. 8, 22 [(1931)]. The United States Supreme Court has described such judicial reluctance as "the exercise of judicial restraint from unnecessary decision of constitutional issues." *Kremens v. Bartley*, 431 U.S. 119, 136 [(1977)], *quoting*, *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 138 [(1974)].

> The instant appeal presents a situation involving an intervening change in the factual posture of the case as well as an intervening change in the applicable law.

*In re Gross*, 382 A.2d 116, 119-20 (Pa. 1978). *See also Mistich*, 863 A.2d at 121 ("'We are not in the business of pronouncing that past actions which have no demonstrable continuing effect were right or wrong.'") (citation omitted).

Nevertheless, Petitioners Brouillette and Lewis contend that the instant matter should not be dismissed because the foregoing claims fall within an exception to the mootness doctrine, i.e., that the constitutional violations are capable of repetition, but will likely evade judicial review. *See* Petitioners' Memorandum in Opposition to Application to Dismiss for Mootness at 9-18. However, "[i]t is only in very rare cases where exceptional circumstances exist or where matters or questions of great public importance are involved, that this court ever decides moot questions or erects guideposts for future conduct or actions." *Wortex Mills*, 85 A.2d at 857. Moreover, in order for their constitutional claims to fall within the foregoing exception to the mootness doctrine, Petitioners Brouillette and Lewis must demonstrate that: "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [i]s a

40

reasonable expectation that the same complaining party w[ill] be subjected to the same action again." *Mistich*, 863 A.2d at 121 n.6 (citing *Sosna v. Iowa*, 419 U.S. 393 (1975).

In light of the foregoing requirements, it must be noted that Petitioners filed their initial petition for review in this Court over a year after the General Assembly's enactment of the General Appropriations Bill for FY2016-17 and two and one-half months after the enactment of the General Appropriations Bill for FY2017-18. Petitioners did not file the instant Amended Petition until nearly two months later, requested and obtained an extension of time to respond to Respondents' preliminary objections to the Amended Petition, ultimately filing answers more than three months hence. After we scheduled oral argument on Respondents' POs for this Court sitting *en banc* in May of 2018, Petitioners requested and obtained a continuance of the oral argument to September of 2018.

Petitioners have never sought to expedite the consideration or disposition of this matter throughout its pendency,[28] in fact delaying its consideration and disposition, while the intervening passage of time and enactment of legislation rendered moot the foregoing constitutional claims. Like the Superior Court,

> We conclude, therefore, that appellants' failure to ask the trial court to stay the proceedings before the order sought to be reviewed ceased to have any practical effect rendered any subsequent challenge to the order moot. A method to seek review of the instant claim before it became academic existed, and appellants did not avail

---

[28] *See, e.g.*, Pa. R.A.P. 105(a) ("In the interest of expediting decision, or for other good cause shown, an appellate court may . . . disregard the requirements or provisions of any of these rules in a particular case on application of a party or on its own motion and may order proceedings in accordance with its direction.").

41

> themselves of it. Under these circumstances, we find the instant appeal to be moot and decline to address the issues belatedly raised herein.

*Commonwealth v. Dorler*, 588 A.2d 525, 528 (Pa. Super. 1991) (citations omitted). Further, Petitioners fail to allege or demonstrate that the stated constitutional infirmity has otherwise occurred in the past, is apparent in the General Appropriations Bill enacted for FY2018-19 or in the General Appropriation Bills relating to FY2019-20, or that there is any likelihood of such a constitutional violation occurring in the future. Under these circumstances, we are not inclined to apply this rarely invoked exception to the mootness doctrine. Accordingly, the Application is granted and Count II of the Amended Petition is dismissed as moot.

## VI.

Finally, with respect to the Governor's, Treasurer's, and Auditor General's purported violation of Article 8, Section 7 of the Pennsylvania Constitution as alleged in Count III, the Governor and the Treasurer demur,[29] in relevant part, on the basis that Petitioners Brouillette and Lewis fail to state a valid claim for declaratory relief. Again, we agree.

As outlined above, Article 8, Section 7(a)(2)(ii) of the Pennsylvania Constitution states, "The Governor, State Treasurer and Auditor General, acting jointly, may . . . incur debt for the purpose of refunding other debt, if such refunding debt matures within the term of the original debt." Pa. Const. art. VIII, §7(a)(2)(ii). In turn, Article 8, Section 7(c) provides, in pertinent part, that "[a]s used in this section, debt shall mean the issued and outstanding obligations of the

---

[29] Again, the Auditor General did not preliminarily object, but instead filed an answer to the Amended Petition and a notice of non-participation in these proceedings.

Commonwealth and shall include obligations of its agencies or authorities to the extent they are to be repaid from lease rentals or other charges payable directly from revenues of the Commonwealth." Pa. Const. art. VIII, §7(c).

The Amended Petition alleges, in relevant part: (1) "In FY2016-17, "[the Treasurer, Governor, and Auditor General] authorized the Commonwealth to borrow $2.5 billion on a line of credit from the State Treasury"; (2) "[the Treasurer, Governor, and Auditor General] used these funds to address the revenue shortfall in the Budget for FY2016-17"; (3) "For FY2016-17, because Respondents authorized the spending set forth in [the] General Appropriations Bill, which exceed actual and estimated revenues, the Commonwealth ended the fiscal year with a $1.55 billion deficit"; (4) "[the Treasurer, Governor, and Auditor General] approved a $750 million line of credit in August 2017, in part to fulfill the obligations of the prior fiscal year"; (5) "because the $1.55 billion deficit remained unfunded, [the Treasurer, Governor, and Auditor General] authorized ostensibly intra-year lines of credit to illegally enable the Commonwealth to spend money across fiscal years and impermissibly fund spending in FY2016-[17] that exceeded actual and estimated FY016-[17] revenues"; and (6) "[the Treasurer, Governor, and Auditor General], therefore, impermissibly authorized the Commonwealth to incur long-term debt in violation of Article [8], Section 7 of the Pennsylvania Constitution[.]" *Id.* ¶¶111-115, 118.

Petitioners argue "that [the Treasurer] has authorized the accrual of debt that was not repaid during the fiscal year in which the debt was incurred in direct contravention of Article [8], Section 7(a)(2)(ii)," and that "[t]hese allegations, in conjunction with the other allegations in the [Amended Petition], accepted as true, are sufficient to establish a violation of Article [8], Section

43

7(a)(2)(ii)." Petitioners' Omnibus Brief in Opposition to the Preliminary Objections at 46-47.

In *Johnson v. Pennsylvania Housing Finance Agency*, 309 A.2d 528 (Pa. 1973), a taxpayer filed an equity action challenging the constitutionality of the Housing Finance Agency Law (HFAL).[30] The HFAL was enacted to address a housing shortage with respect to low and moderate income and elderly individuals and families. To this end, the HFAL created the Housing Finance Agency (Agency) to administer programs involving housing purchases and rentals under which the Agency was empowered to lend funds to a mortgagor to construct or rehabilitate housing units for sale to qualifying individuals or families. After the unit was sold, the original mortgagor's obligation to the Agency was released, and the purchaser assumed the mortgage obligation to the Agency. Accordingly, the HFAL authorized the Agency to issue loans directly to qualifying individuals. Additionally, under the rental program, the HFAL authorized the Agency to provide mortgages for projects supplying housing units to qualifying individuals, which subject the mortgagors to regulation and limitation in the rents charged and the permissible profits earned.

To finance the foregoing programs, the HFAL empowered the Agency to issue bonds and notes to be payable out of the Agency's revenue, including the proceeds of the mortgages. However, the HFAL specifically provided the Agency's notes and bonds did not constitute a debt of the Commonwealth or any political subdivision and that it was not a pledge of its credit or taxing power. Moreover, the Agency was required to establish a fund equal to all the principal

---

[30] Act of December 3, 1959, P.L. 1688, *as amended*, added by the Act of December 5, 1972, P.L. 1259, 35 P.S. §§1680.101-1680.603a.

44

and interest due on its outstanding bonds and notes from the succeeding calendar year. In the event of a deficiency in the fund, or a default in the payment of principal or interest, the Agency was required to submit a request to the Governor who was then required to request the General Assembly for funds in the executive budget to cover the shortfall; however, the General Assembly was not required to approve such an appropriation. The HFAL also provided that the Commonwealth would not impair the rights and remedies of the holders of Agency obligations.

The taxpayer alleged, *inter alia*, that the HFAL was "unconstitutional in that it authorizes a debt to be incurred by or on behalf of the Commonwealth in violation of Article [8], Section 7 of the Pennsylvania Constitution, and permits an improper loan or pledge of the Commonwealth's credit in contravention of Article [8], Section 8.[31]" *Johnson*, 309 A.2d at 535. Specifically, the taxpayer claimed "because the H.F.A.L. provides that the Legislature is 'enabled to provide appropriations sufficient to make up any . . . deficiency [in the Agency's Capital Reserve Fund] or otherwise to avoid any default,' the credit of the Commonwealth is being unconstitutionally 'pledged or loaned.'" *Id.* at 536. The Supreme Court held, "[t]hat argument is flawed in two crucial respects." *Id.*

The Supreme Court explained:

> Firstly, even if this be viewed as a pledge of the Commonwealth's credit, the pledge extends only to the [Agency], and not to 'any individual, company, corporation or association . . . .' P[a.] Const. [art.] VIII, [§]8. This activity is not constitutionally proscribed. This Court [has] made clear . . . that '(i)f credit is being

---

[31] Pa. Const. art. VIII, §8. Article 8, Section 8 states, in relevant part, "The credit of the Commonwealth shall not be pledged or loaned to any individual, company, corporation or association . . . ."

lent to anyone, it is being lent to the (Agency).' We have already noted that the [Agency] is not an 'individual, company, corporation or association' within the meaning of Article [8], *Sections 7 or 8*.[32]

> Moreover, as the permissive language of the H.F.A.L. indicates, no mandatory obligation is imposed upon the Legislature to appropriate any funds whatsoever to cover an Agency default or Capital Reserve Fund deficiency. The 'moral makeup' clause of the H.F.A.L. merely 'constitutes . . . an expression of a future intention or expectation which has no legally binding effect.'

> In view of our determination that the Commonwealth is not a guarantor of the Agency's obligations, no purchaser or holder of [Agency] bonds or notes has any basis 'for relying to any extent on any appropriation . . . by the present or any subsequent Legislature, despite the amorphous legislative declaration of intention . . .' that appropriations may be made.

*Id.* (emphasis added and citations omitted).

Likewise, in the case *sub judice*, Petitioners' constitutional claim is equally flawed. The "debt" referred to in Article 8, Section 7(a)(2)(ii) is defined in Section 7(c) as "mean[ing] the issued and outstanding obligations of the Commonwealth . . . ." As explained *supra*, this "constitutional provision is to be interpreted insofar as possible in terms of its spirit and intention," and it "is to be interpreted in its popular sense as understood by the people who adopted it." *Stilp*, 974 A.2d at 495 (citations omitted). This is particularly true with respect to the use of the term "debt" in Article 8, Section 7(a)(2)(ii) because, as the Supreme Court explained long ago, "The words 'debt' and 'indebtedness' [as used in the Constitution] * * * are not used in any technical way, but in their broad, general

---

[32] As noted *supra*, "where two provisions of our Constitution relate to the same subject matter, they are to be read *in pari materia*." *Jubelirer*, 953 A.2d at 528 (citations omitted).

meaning, of all contractual obligations to pay in the future for considerations received in the present.'" *Kelley v. Earle*, 190 A.140, 146 (Pa. 1937) (citation omitted). *See* Black's Law Dictionary 488 (10th ed. 2014) (defining "debt," in relevant part, as "[l]iability on a claim; a specific sum of money due by agreement or otherwise," and "[t]he aggregate of all existing claims against a person, entity, or state[.]").

There are absolutely no allegations in the Amended Petition that the "lines of credit" utilizing revenue in the Commonwealth Treasury to fund the purported budget deficiencies involve the acquisition of any "debt" in the constitutional sense with a party outside of the Commonwealth government. As a result, the actions of the Governor, the Treasurer, and the Auditor General with respect to the use of the lines of credit cannot be deemed to constitute an unconstitutional "debt" that was an "issued and outstanding obligation[] of the Commonwealth."[33]

---

[33] *See also In re Bond Issuance of Greater Enatchee Regional Events Center Public Facilities District*, 287 P.3d 567, 579-80 (Wash. 2012), wherein the Washington Supreme Court, interpreting similar provisions in the Washington Constitution, stated the following:

> Under article VIII, section 1 (state debt), "debt" is "construed to mean *borrowed money* represented by bonds, notes, or other evidences of indebtedness that are secured by the full faith and credit of the state or are required to be repaid, directly or indirectly, from general state revenues." WASH. CONST. art. VIII, §1(d) (emphasis added). Section 6 (municipal indebtedness) contains no definition of the term "indebted." But the definition of "debt" contained in section 1 should be equally applied to the term "indebtedness" as used in section 6.
>
> The history of article VIII reveals that "debt" and "indebtedness" were intended to mean the same thing. *See* Theodore L. Stiles, *The Constitution of the State and Its Effects*

**(Footnote continued on next page…)**

(continued...)

*Upon Public Interests*, 4 WASH. HIST. Q. 281, 284 (1913) (by adopting article VIII, the framers were concerned about the misuse of "borrowed money" by state and local governments). Indeed, the title of article VIII—"State, County, and Municipal Indebtedness"—reveals that the drafters used debt and indebtedness interchangeably. As does the section 6 definition itself. Wash. Const. art. VIII, §1(d) (debt requires "evidences of indebtedness"). The terms are also used interchangeably in article VIII, section 3, which permits the state to incur "[s]pecial *indebtedness*" in certain circumstances, notwithstanding the limitation on "debt" set forth in article VIII, section 1. (Emphasis added.) Black's Law Dictionary likewise defines "indebtedness" as a synonym for debt: "indebtedness" means "[s]omething owed; a *debt*." BLACK'S LAW DICTIONARY 836 (9th ed. 2009) (emphasis added). We have accordingly concluded that "when the men who drafted the constitution used the word 'debt,' they were thinking *solely in terms of borrowed money*." *State ex rel. Troy v. Yelle*, 36 Wash.2d 192, 197, 217 P.2d 337 (1950) (emphasis added).

This analysis is confirmed by *State ex rel. Wittler v. Yelle*, 65 Wash.2d 660, 668–69, 399 P.2d 319 (1965), where we explained, "This court has many times said what Article 8 means by the word 'debt.' We think that it means borrowed money; it denotes an obligation created by the loan of money, usually evidenced by bonds but possibly created by the issuance of paper bearing a different label." State debt was at issue in that case, but our analysis was founded on a "panoramic view of our cases affecting constitutional debt limitation." *Id.* at 669, 399 P.2d 319. In reaching the conclusion that debt means "borrowed money, debts created by the issuance of bonds," we relied in part on two cases: *Winston v. City of Spokane*, 12 Wash. 524, 41 P. 888 (1895) and *Comfort v. City of Tacoma*, 142 Wash. 249, 252 P. 929 (1927). The *Winston* and *Comfort* cases each interpreted municipal indebtedness squarely within the context of article VIII, section 6. In other words, our jurisprudence defining "debt" as borrowed money encompasses both municipal and state debt. *See* ROBERT F. UTTER & HUGH D. SPITZER, THE WASHINGTON STATE CONSTITUTION: A REFERENCE GUIDE 145 (2002) ("As with state

**(Footnote continued on next page…)**

In the absence of any allegation in this regard, this Court cannot declare that the Governor, the Treasurer, or the Auditor General unconstitutionally incurred debt by authorizing the transfer of Commonwealth revenue between Commonwealth entities within the relevant fiscal years to facilitate the operation of the Commonwealth government for those fiscal years.[34]  Accordingly, the POs in

---

**(continued…)**

> obligations, debt [under article VIII, section 6] is defined as borrowed money payable from taxes.").

[34] It is in this respect that Petitioners' reliance on *Commonwealth ex rel. Schnader v. Liveright*, 161 A. 697 (Pa. 1932) is misplaced.  In that case, the Supreme Court interpreted the former constitutional provision, Article 9, §4, which provided:

> 'No debt shall be created by or on behalf of the State, except to supply casual deficiencies of revenue, repel invasion, suppress insurrection, defend the State in war, or to pay existing debt; and the debt created to supply deficiencies in revenue shall never exceed in the aggregate, at any one time, one million dollars[.]'

*Id.* at 706.  At issue therein was the enactment by the General Assembly at a Special Session of an appropriations bill, the "Talbot bill," totaling $10,000,000.00 for relief to the poor and unemployed during the Great Depression.  The Supreme Court held, in pertinent part:,

> Under the Constitution, neither the Legislature, the officers or agents of the state, nor all combined, can create a debt or incur an obligation for or on behalf of the state, except to the amount and in the manner provided for in the fundamental law. *This section was intended to restrict legislative acts which incurred obligations or permitted engagements on the credit of the state beyond revenue in hand or anticipated through a biennium*, and establishes the principle that we must keep within current revenue and $1,000,000.

*Id.* at 706 (emphasis added).  *See also Montgomery v. Martin*, 143 A. 505, 506-07 (Pa. 1928) (citations omitted), wherein the Supreme Court explained:

**(Footnote continued on next page…)**

the nature of a demurrer with respect to the claim in Count III that the Governor, the Treasurer, and the Auditor General violated Article 8, Section 7(a)(ii) of the Pennsylvania Constitution are sustained, and this claim is dismissed.[35]

## VII.

Accordingly, based on the foregoing, the POs challenging the standing of Petitioners Brouillette and Lewis as to Counts I, II, and III of the Amended Petition are overruled; the POs challenging the standing of Petitioner Christiana are sustained and he is dismissed as a party as to Count III of the Amended Petition; the PO challenging the joinder of the Commonwealth generally as a party is sustained and it is dismissed as a party as to Counts II and III of the Amended Petition; the POs in the nature of a demurrer as to Counts I and III of the

---

**(continued…)**

> In this country the Legislature of a state represents the sovereign will of a sovereign people, and, in the absence of constitutional restrictions, can authorize the state to borrow any amount of money for any purpose it sees fit; therefore [the former] section 4 of article 9 of our Constitution must be viewed as a restrictive measure, and the proviso with which we are particularly dealing must be treated as part of the general provision to which it is attached. In other words, the main purpose of the section in question is to limit the inherent right of the state to borrow money, and the proviso, by qualifying this restriction, becomes part of it.

[35] Because Petitioners Brouillette and Lewis limit this claim to Article 8, Section 7(a)(ii), we need not examine the mechanics of the extension of the lines of credit through the actions of the Governor, Treasurer or Auditor General, or the Treasurer's authority to extend them or to maintain the revenue from which they are derived under the relevant statutory provisions.

Amended Petition are sustained; the Application to dismiss Count II is granted; and the Amended Petition is dismissed.[36]



MICHAEL H. WOJCIK, Judge

President Judge Leavitt and Judge McCullough concur in the result only.
Judge Covey and Judge Fizzano Cannon did not participate in the decision of this case.

---

[36] Based on our disposition of the foregoing POs and Application, all of the remaining POs are overruled as moot.

51

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Matthew J. Brouillette and Rep.   :
James Christiana and Benjamin   :
Lewis,   :
  :
              Petitioners   :
  :
            v.   :  No. 410 M.D. 2017
  :
Thomas Wolf, Governor and Joseph   :
Torsella, Treasurer and Eugene   :
DePasquale, Auditor General and   :
The Commonwealth of Pennsylvania   :
and Michael Turzai, Speaker of the   :
House of Representatives and Dave   :
Reed, House Majority Leader and   :
Joseph B. Scarnati, III, President Pro   :
Tempore of the Senate and Jake   :
Corman, Senate Majority Leader and   :
The Pennsylvania General Assembly,   :
  :
           Respondents:

# **O R D E R**

AND NOW, this 2nd day of July, 2019, the preliminary objections of the above-named Respondents challenging the standing of Petitioners Brouillette and Lewis as to Counts I, II, and III of the Amended Petition for Review (Amended Petition) are OVERRULED. Respondents' preliminary objections challenging the standing of Petitioner Christiana are SUSTAINED, and he is DISMISSED as a party to Count III of the Amended Petition. Respondents' preliminary objection challenging the Commonwealth of Pennsylvania generally as

a party is SUSTAINED, and it is DISMISSED as a party to Counts II and III of the Amended Petition.  The Respondents' preliminary objections in the nature of a demurrer as to Counts I and III of the Amended Petition are SUSTAINED; the Respondents' Application to Dismiss Count II based on mootness is GRANTED; and the Amended Petition is DISMISSED.

_____
MICHAEL H. WOJCIK, Judge