## Woodward *v.* Philadelphia et al.

Argued December 19, 1938. Before KEPHART, C. J., SCHAFFER, MAXEY, LINN, STERN and BARNES, JJ.

*Wm. A. Schnader,* of *Schnader & Lewis,* for plaintiff.

*G. Coe Farrier,* Assistant City Solicitor, and *Joseph Sharfsin,* City Solicitor, with them *Ernest Lowengrund,* Assistant City Solicitor, for defendants.

*Michael T. McManus,* of *McManus & McManus,* for White, defendant.

OPINION BY MR. CHIEF JUSTICE KEPHART, December 23, 1938:

Plaintiff, as a taxpayer and on behalf of other taxpayers, has been granted leave to file a bill in equity in this Court, and we have assumed original jurisdiction in the matter, involving the finances of the City of Philadelphia.

The purpose of the bill is to secure a decision from this Court interpreting issues arising under Sections 1, 2 and 3 of Article XVII, of the City Charter Act of June 25, 1919, P. L. 581. The plaintiff avers that under this Article the defendant City Controller does not have any authority to estimate for the Council of the City of Philadelphia the receipts for 1939 from taxation of any kind, but that it is the duty of the Council of the City of Philadelphia to make and use its own estimates of the receipts from taxes in ordaining the budget as required by Article XVII, Section 2 of the Charter Act. It asks that the City and the members of the City Council be enjoined from adopting a budget for the year 1939 until the Council shall have made its own estimates of receipts from taxation, and that the City Controller be enjoined from compelling the Council to accept his estimate for the receipts from taxes. It is further asked that this Court review the estimates made by the City Controller of receipts other than from taxation.

The financial Article of the Charter Act[1] was intended to embrace all the considerations necessary for a complete budget for the City of Philadelphia. It groups the receipts of the city into three classes: (a) receipts from taxation; (b) money proposed to be borrowed; and (c) receipts from sources other than taxation and loans, hereinafter designated as miscellaneous receipts. It is

[1] Act of June 25, 1919, P. L. 581, Article XVII.

because of the interpretation of this Act by administrative officers in the past, and its application to these various items of controversy detailed by the bill, that the questions which are now presented to us have arisen.

In addition to the authority and duty of the various officers, we will discuss the Charter Act as it relates to the disputed items, that is, receipts from taxation and miscellaneous receipts. It is evident by an examination of Article XVII of the Act that the difficulty in determining the duties of the Mayor, the City Council and the City Controller, comes from apparently conflicting provisions in the Article. Stripping it of all unnecessary language as it applies to the problems involved, Section 1 reads: "On or before the fifteenth day of October . . . the mayor shall furnish to the council . . . a statement of the estimated receipts, *other than from taxation*. . . ."—and—". . . The estimates of receipts . . . shall be furnished to the mayor by the city controller. . . ." Up to this point it is evident that receipts from taxation should not be included in any statement or estimate submitted by the Controller or the Mayor. The Charter Act goes on: "Such statements shall be made up by the city controller from the best available data, and the receipts from sources other than taxation . . . shall be estimated at the average of such receipts for the preceding three years. . . ." [Then follows a provision for the treatment of new sources of receipts not existing during all or a part of that period, and for sources which have existed during all or a part of that period which will not be available for the ensuing year, and further, for other factors not previously existing.] We shall discuss this paragraph later, but it is plainly apparent that it applies only to miscellaneous receipts which shall be "estimated at the average . . . for the preceding three years," and not to receipts from taxation. Then follows this provision: "The estimates [which the Mayor transmits to Council] . . . shall also contain *a statement* of the average proportion of

taxes uncollected at the end of each of the three preceding years. . . ." This also is reserved for later discussion, but it will be noticed there is no direction as to what is to be done with this "statement" of the Controller as to the *average proportion of taxes* uncollected for three years, or how it is to be applied.

Under the Act neither the Mayor nor the Controller has any authority to submit any binding or controlling estimate or statement of receipts from taxation. The estimation of revenue which Council expects to derive from taxation is purely an administrative matter and it was not intended that the Controller should supervise, direct or usurp the responsibility of Council either in selecting the form of taxation or determining the amount of revenue to be derived therefrom. The Act makes this plain when it restricts the estimate of the Controller to "receipts *other than from taxation.*"

Council's judgment in arriving at the return of ensuing taxes may be guided or assisted, but not limited by the Controller's statement of the *"average proportion of taxes uncollected at the end of the three preceding years."* As we stated above, the Act does not direct Council to accept this statement as final and conclusive; it directs that the statement be made, and, in view of what precedes this paragraph, it was inserted in the Act for the information of Council to enable them, as far as they deem wise, to determine the possible revenues from the forms of taxation which have been in use for three years. If, in the judgment of Council, the stated proportion of uncollected taxes for the last three years is too high, this proportion may be reduced by them; if it is too low it may be raised, and on that basis Council may make a final determination as to what the probable revenues will be from taxation. It is argued that the difficulty comes, not from the interpretation of Section 1 or Section 2, as they apply to taxation, but from what is stated in Section 3 as to the average of uncollectible taxes for three years.

Before discussing Section 3, it may be noted that Section 2 states that after the receipt of the Mayor and Controller's statement, Council shall consider (deliberate or discuss) it in open sessions, and *shall thereupon adopt by ordinance a financial program showing the estimated receipts from all sources*—clearly this included the receipts from taxation as estimated by Council, the miscellaneous receipts and receipts from borrowed money. Thus far the path is clear; as an illustration, take revenue from real estate taxes—plaintiff in his bill avers that the stated proportion of uncollected real estate taxes for the three years is too high, because in past years it has been demonstrated by actual collections that the proportion certified as uncollectible has been far in excess of the uncollected taxes at the end of the year. In the year 1937—it was estimated, and so certified, that uncollectible revenues for that year would be $9,600,000. As a matter of fact, at the end of 1937, there was only some $4,600,000 outstanding. Guided by the actual facts, it is urged that Council could well disregard the Controller's statement of averages, and it would be well within the realm of safety if it adopted a budget showing uncollectible real estate taxes of about $4,243,000.

The supposed difficulty now comes from Section 3, which states that in fixing the tax rate the receipts from taxation shall be estimated by Council by deducting, from the gross amount which would be yielded, the average proportion of the amount uncollected at the end of each year during the preceding three years. There is some confusion if this provision attempts to influence the makeup of the budget. The difference in phraseology between Sections 1 and 3 concerning the use of taxes uncollected in the preceding three years is only apparent and not real. In the opinion of all but one of the members of the Court the language of Section 3 in this respect was intended by the legislature to be directory and not mandatory. This must follow from the rule that we cannot attribute to the legislature an intention

to impose a greater tax burden than necessary.[2] If, therefore, as is the fact, a larger proportion of taxes is shown to have been collected in the prior three years than the proportion indicated, that result must have been intended. Under this interpretation, if Council concurs in plaintiff's view, that, guided by results in the past, the average is too high, it may raise the estimate of receipts from real estate taxes at least $1,200,000 and to that extent relieve the taxpayers of Philadelphia of a burden in new taxes.

As we are now discussing taxation, and the question has been raised as to probable future revenues derived from new forms of taxation, we may state, in ascertaining what the term taxation means, that taxes are defined to be burdens or charges imposed by the legislative power upon persons or property to raise money for public purposes, and to defray the necessary expenses of government. Taxation is proportional contribution by persons or property. Any levy of duty or impost for the support of government may be regarded as a tax, and money due therefrom may be regarded as taxes due, whether delinquent or not. The tax due retains that characteristic until it is reduced to a judgment; then, as a judgment it carries with it certain attributes not possessed by the ordinary judgment.

The important point to be here decided, inasmuch as it was stated at oral argument and in the bill that new taxes must be levied to meet a deficit, is that the estimated return from such new levies is a matter for Coun-

---

[2] An apparent contradiction in the terms of the statute must be resolved in accord with the Statutory Construction Act of May 28, 1937, P. L. 1019, which reads: "Section 52. Presumptions in Ascertaining Legislative Intent.—In ascertaining the intention of the Legislature in the enactment of a law, the courts may be guided by the following presumptions among others: (1) That the Legislature does not intend a result that is absurd, impossible of execution or unreasonable; (2) That the Legislature intends the entire statute to be effective and certain."

cil. They must determine the amount that such levies will return, and, having determined it, they may place it in the budget ordinance as estimated receipts from that particular levy. Their judgment, however, in this respect, as in all other matters committed to their administrative care, must not be arbitrary or capricious, but must represent good faith and fairness in estimating what they believe to be a just return. Courts will not interfere with administrative officers, or municipal legislative officers of this character unless their powers are abused to the prejudice of the public; then the courts may be resorted to by one who is aggrieved thereby. Whatever estimate there may be by Council on the returns from any form of taxation, when approved by the Mayor or passed over his veto, it is binding on the City Controller.

Another illustration which may be discussed in this connection is the personal property tax return, the basis of which, in the large percentage of cases, is a fluctuating medium determined by values fixed on the stock exchange. The value of those types of taxables that are not affected by the stock exchange, is fixed by the Board of Revision of Taxes, and, for the current year, fixed at face value. It is imperative, if Council is to get a fair return, and the taxpayer is to receive fair treatment, that a date should be selected as near the closing date of the year as is possible under all the circumstances. Using the present controversy as a subject of illustration,—the base has been taken as of December 31, 1937, and, as we have passed December 15, 1938, the values as of that date might be taken to fix a new basis for 1939. The average percentage of increase or decrease in these values may be readily ascertained, and it should not take very long to reach a result. If, as the plaintiff states, there was a general increase of twenty per cent in values of all securities, that should be a known fact today, and, applied to the base of 1937, it would produce a very large increase in values and therefore in esti-

mated revenue from the personal property tax. The plaintiff estimates the increased receipts at $700,000, or more. If Council finds this to be correct, they may increase their estimated receipts to that amount or whatever amount they find would be a reasonably fair estimate of return.

The third item which should now be considered is that of delinquent taxes. There can be no question that these items of indebtedness represent taxes; they should be so considered. But the Controller's counsel insists that they must be included in the miscellaneous class. On either horn of the dilemma the Controller is impaled; he has undercut the estimate of receipts some $4,384,000 from the three-year average directed by law. This is a considerable burden to be put upon the oppressed taxpayers of this City. If we regard receipts from delinquent taxes as money due from taxation, then the Controller would have nothing whatever to do with this item, and it would be for Council to fix the estimated receipts from delinquent taxes that should be returned for 1939. Council in its judgment may use the average of delinquent tax collections for the preceding three years as a standard to measure estimated receipts from delinquent taxes for the ensuing year. We are of one mind that this item, alone, would increase the estimate of receipts some $4,300,000 for 1939.

We now come to the third class, or miscellaneous receipts. Here the Controller is confronted with a more or less hard and fast legislative rule. The Act says, as we noted above, that these receipts "shall be estimated at the average . . . for the preceding three years. . . ." We do not have here any confusion; the Act leaves the Controller with no alternative. It further provides, however, the Controller shall consider "other factors not previously existing." This latter language must have reference to something other than the proportion or average adopted by the legislature, but is not tantamount to a grant of absolute discretion. If that body intended

that the Controller should have absolute discretion in the matter, then there was no necessity to write in the proportionate or average theory of measurement. The legislature has set up a standard or yardstick to measure these miscellaneous receipts which must be adhered to. As the legislature has stated as to such receipts, that the estimate of the Controller and the Mayor should be conclusive and binding on Council, it is more important that an arbitrary discretion, which may be abused, be controlled by the yardstick which the Act has laid down as the rule by which miscellaneous receipts for an ensuing year may be measured. But if the estimate on its face shows the law has not been adhered to, Council may change it.

The item particularly complained about in the bill in this regard, and one which exemplifies our meaning is the receipts from magistrates' costs and fines. For the year 1937 there was collected more than $338,000. The average for the preceding three years was more than $245,000; yet, notwithstanding the positive language of the statute, the Controller allows only $100,000 from this source, because, in his judgment, the traffic court had been abolished and the receipts would fall off, though there were other tribunals to administer the same justice. However that may be, and though it would seem that even $245,000 is a low figure of estimate, as the legislature has directed the average to be taken, the Controller should have certified that average.

Coming now to Section 2, it states: "Council shall be bound to accept the estimates of receipts . . . furnished to the mayor by the city controller. . . ." This estimate, as stated above, has relation solely to miscellaneous receipts and to nothing else. As we have indicated, Council must make up its own estimate of receipts from taxation. When it has performed this duty, and accepted, as it is bound to do, the Controller's estimates of miscellaneous receipts, on this basis it may form its budget ordinance. If the prospective receipts as thus

outlined are less than the estimated expenditures, of course, Council will have to provide new revenue or cut down expenses; that is solely a matter for Council, but the budget ordinance predicated upon the estimate at which Council has arrived, when adopted, is binding on the Mayor and Controller, and with it as a base he may lawfully countersign warrants for the payment of the City's indebtedness, salaries, pay roll, et cetera, as provided by law.

We will retain jurisdiction of the bill, lift the preliminary injunction so that Council may proceed, and direct that a copy of the bill and the answer, and of this opinion, be forwarded to Council to be submitted to the Finance Committee that proper and immediate action shall at once be taken to complete the financial program of the City.