# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Ramez Ziadeh, Acting Secretary :
of the Department of Environmental :
Protection and Acting Chairperson of :
the Environmental Quality Board, :
 :
     Petitioner :
 :
    v. : No. 41 M.D. 2022
 : Argued: November 16, 2022
Pennsylvania Legislative Reference :
Bureau, Vincent C. DeLiberato, Jr., :
Director of the Legislative Reference :
Bureau, and Amy J. Mendelsohn, :
Director of the Pennsylvania Code :
and Bulletin, :
 :
     Respondents :

BEFORE: HONORABLE RENÉE COHN JUBELIRER, President Judge
    HONORABLE PATRICIA A. McCULLOUGH, Judge
    HONORABLE MICHAEL H. WOJCIK, Judge
    HONORABLE ELLEN CEISLER, Judge
    HONORABLE LORI A. DUMAS, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE WOJCIK       FILED: November 1, 2023

   Before the Court are the cross-applications for summary relief (cross-ASRs) filed by the petitioner and intervenors[1] in the above-captioned matters

---

[1] On March 3, 2022, we granted the Applications to Intervene filed by then-President Pro Tempore of the Pennsylvania State Senate Jake Corman, Senate Majority Leader Kim Ward, Chair **(Footnote continued on next page…)**

regarding the February 3, 2022 Petition for Review in the Nature of a Complaint for Permanent and Peremptory Mandamus and for Declaratory Relief (PFR) filed in our original jurisdiction by Patrick J. McDonnell, Secretary of Environmental Protection and Chairperson of the Environmental Quality Board (EQB) (Secretary McDonnell)[2] against the Pennsylvania Legislative Reference Bureau (LRB), its director Vincent C. DeLiberato, and Director of the Pennsylvania Bulletin and Pennsylvania Code Amy J. Mendelsohn (collectively, Respondents). The PFR relates to Pennsylvania's participation in the Regional Greenhouse Gas Initiative (RGGI) based on regulations promulgated by the Pennsylvania Department of Environmental Protection (DEP), on behalf EQB, referred to as the "Trading Program Regulation" (Rulemaking). Following careful consideration, we grant in part, and dismiss in part, the cross-ASRs,[3] and grant the requested declaratory and injunctive relief in part.

---

of the Senate Environmental Resources and Energy Committee Gene Yaw, and Chair of the Senate Appropriations Committee Pat Browne (collectively, Senate); and Speaker of the House of Representatives Bryan D. Cutler, Majority Leader of the House Kerry A. Benninghoff, and Chairman of the House Environmental Resources and Energy Committee Daryl D. Metcalfe (collectively, House). Our use of the terms "Senate" and "House" does not imply that these intervenors are acting on behalf of the Senate or the House as a whole.

[2] When the PFR was filed, Secretary McDonnell was the Secretary of Environmental Protection and Chairperson of the Environmental Quality Board. However, his service in that office ended on July 1, 2022, and Acting Secretary Ziadeh has been substituted as Petitioner in this matter pursuant to Pa.R.A.P. 502(b). We continue to refer to Secretary McDonnell for ease of discussion.

[3] In considering the cross-ASRs, it is appropriate for this Court to take judicial notice of our prior memorandum opinions and orders in this matter in *Ziadeh v. Pennsylvania Legislative Reference Bureau* (Pa. Cmwlth., No. 41 M.D. 2022, filed July 8, 2022) (*Ziadeh I*), and *Ziadeh v. Pennsylvania Legislative Reference Bureau* (Pa. Cmwlth., No. 41 M.D. 2022, filed January 19, 2023) (*Ziadeh II*), and in the related matter in *Bowfin KeyCon Holdings, LLC v. Pennsylvania Department of Environmental Protection* (Pa. Cmwlth., No. 247 M.D. 2022, filed July 8, 2022) (*Bowfin*), and the various filings on the dockets of these cases. *See, e.g.*, Pa.R.E. 201(b)(2) (permitting courts to take judicial notice of facts that may be "determined from sources whose **(Footnote continued on next page…)**

As this Court has summarized from the various pleadings in this matter:

> [T]he Rulemaking provides for Pennsylvania's participation in the [RGGI]. The RGGI requires electric generation plants (covered sources) located in participating states to purchase one allowance for each ton of carbon dioxide ($CO_2$) they emit. Each state participating in the RGGI establishes a declining $CO_2$ budget that effectively limits the total $CO_2$ that the covered sources are permitted to emit. The allowances are auctioned off quarterly by RGGI, Inc., and [P]articipating [S]tates receive the proceeds from the auction. The Rulemaking provides that Pennsylvania's proceeds will be used in accordance with the Air Pollution Control Act

accuracy cannot reasonably be questioned"); *Moss v. Pennsylvania Board of Probation and Parole*, 194 A.3d 1130, 1137 n.11 (Pa. Cmwlth. 2018) ("[T]his Court may take judicial notice of information contained in the publicly[ ]available docket of [the underlying proceedings]," and "'[i]t is well settled that this Court may take judicial notice of pleadings and judgments in other proceedings . . . where, as here, the other proceedings involve the same parties.'") (citations omitted); *Elkington v. Department of Corrections* (Pa. Cmwlth., No. 478 M.D. 2018, filed May 27, 2021), slip op. at 9 n.4 ("Although not introduced by the parties, the underlying criminal proceedings are directly related to the claims made here and are referenced throughout the pleadings, and this Court may take judicial notice of the dockets of other courts of the Commonwealth.") (citations omitted); *see also* Pa.R.A.P. 126(b)(1)-(2) ("As used in this rule, 'non-precedential decision' refers to . . . an unreported memorandum opinion of the Commonwealth Court filed after January 15, 2008. . . . Non-precedential decisions . . . may be cited for their persuasive value.").

In *Ziadeh*, we ultimately dismissed Secretary McDonnell's PFR as moot because "it is undisputed that the underlying questions of law presented by the PFR are now moot based on the April 23, 2022 publication of the Rulemaking in the Pennsylvania Bulletin as the $CO_2$ Budget Trading Program," but determined "that Intervenors' Counterclaims [to the PFR] remain extant." *Ziadeh II*, slip op. at 11, 14, n.12. The Secretary's ASR is likewise dismissed as moot based on our memorandum opinion sustaining the preliminary objections of the Senate and the House Intervenors and dismissing the Secretary's PFR in *Ziadeh II* and the disposition herein. Likewise, based on our disposition, the Secretary's Application seeking to amend its Reply and Answer to the Senate Intervenors' New Matter and Counterclaims to raise an objection to standing as New Matter is dismissed as moot.

(APCA)[4] and [] DEP's regulations.[5]   In 2021, the [P]articipating [S]tates received $926 million from the allowance auctions.

---

[4] Act of January 8, 1960, P.L. (1959) 2119, *as amended*, 35 P.S. §§4001-4015.

[5] More specifically, in *Bowfin*, we summarized the relevant stipulated facts as follows:

The Rulemaking establishes a program to limit the emission of $CO_2$ from fossil fuel-fired electric generating units (EGUs) located in the Commonwealth with a nameplate capacity equal to or greater than 25 [megawatts].  The Rulemaking requires the EGUs to obtain allowances for each ton of $CO_2$ emitted and imposes permitting, monitoring, reporting, and record-keeping requirements on them.  It is the position of [the] DEP Secretary[], DEP, EQB, [and proposed intervenors] "that $CO_2$ is a 'pollutant' that can be regulated under Pennsylvania's [APCA]."

Under the Rulemaking, Pennsylvania will distribute $CO_2$ allowances available to each EGU through quarterly regional allowance auctions.  The Rulemaking contains a declining $CO_2$ allowance trading budget that would incrementally reduce the number of $CO_2$ allowances allocated by DEP to the air pollution reduction account for sale via an allowance auction.  The Rulemaking would enable DEP to participate in a multistate $CO_2$ allowance auction, such as [RGGI], provided that participation could provide benefits to the Commonwealth that meet or exceed the benefits conferred on Pennsylvania through its own Pennsylvania-run auction process.  Eleven other states currently participate in RGGI, namely Connecticut, Delaware, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Rhode Island, Vermont, and Virginia.

To become a "Participating State" in RGGI, a state is required to (1) develop a regulation sufficiently consistent with the RGGI Model Rule and (2) sign a contract between the state agency and RGGI, Inc., to engage RGGI, Inc.'s services.  RGGI, Inc. is a [Section] 501(c)(3) non-profit corporation created to facilitate administrative and technical support services to Participating States in RGGI. . . .   In developing the Rulemaking, DEP performed certain modeling that was designed to forecast, among other things, the economic and environmental impacts that would result from the

**(Footnote continued on next page…)**

4

*Ziadeh I*, slip op. at 4-6.

On February 25, 2021, Senate Intervenors filed an Answer with New Matter and Counterclaims to Secretary McDonnell's PFR, which "have taken this case in a new direction." *Ziadeh I*, slip op. at 8. As this Court summarized:

> The Senate's first Counterclaim is that Secretary McDonnell violated article II, section 1[6] and article III, section 9[7] of the Pennsylvania Constitution when he submitted the Rulemaking to the LRB for publication before the House of Representatives had time to consider [Senate Concurrent Regulatory Review Resolution 1 (SCRRR1) disapproving the Rulemaking]. According to the Senate, Secretary McDonnell's action was an attempt to sidestep article III, section 9 and usurp the General Assembly's authority in violation of article II, section 1.[8]

___

> Rulemaking. . . . Any proceeds received by DEP from RGGI auctions and civil fines and penalties for excess emissions will be deposited into the Clean Air Fund.

*Bowfin*, slip op. at 4-6 (citations and footnotes omitted).

[6] Pa. Const. art. II, §1 states: "The legislative power of this Commonwealth shall be vested in a General Assembly, which shall consist of a Senate and a House of Representatives."

[7] Pa. Const. art. III, §9 states:

> Every order, resolution or vote, to which the concurrence of both Houses may be necessary, except on the questions of adjournment or termination or extension of a disaster emergency declaration as declared by an executive order or proclamation, or portion of a disaster emergency declaration as declared by an executive order or proclamation, shall be presented to the Governor and before it shall take effect be approved by him, or being disapproved, shall be repassed by two-thirds of both Houses according to the rules and limitations prescribed in case of a bill.

[8] *See also* article III, section 10 of the Pennsylvania Constitution, which states: "All bills for raising revenue shall originate in the House of Representatives, but the Senate may propose amendments as in other bills." Pa. Const. art. III, §10.

5

The second Senate Counterclaim alleges that the Rulemaking is an *ultra vires* action in violation of the APCA. The APCA, although authorizing [] DEP to promulgate regulations, sets forth bright-line limits on [] DEP's powers. By sending the Rulemaking for publication, [] DEP took significant legal action despite clear statutory prohibitions to the contrary.

The Senate's third Counterclaim asserts that the Rulemaking is an interstate compact or agreement, which is within the General Assembly's exclusive constitutional authority to enter. In addition to this power being constitutionally reserved to the General Assembly, Section 4(24) of the APCA specifically states that [] DEP may formulate interstate air pollution control compacts or agreements *for submission to the General Assembly*. 35 P.S. §4004(24). In its fourth Counterclaim, the Senate alleges that the Rulemaking is a tax and that the imposition of taxes is within the exclusive authority of the General Assembly. The Senate recognizes that the APCA allows for the collection of fines, penalties, and fees, including fees to cover the direct and indirect costs of administering the APCA. Here, however, the Rulemaking amounts to a tax. The courts have held that a fee may constitute a tax where the revenue generated exceeds the costs reasonably necessary to operate the program. The Senate references the 2021-22 budget for [] DEP of $169 million and notes yearly participation in the RGGI could generate over $650 million. Finally, the Senate's fifth Counterclaim is that[] DEP failed to comply with the Commonwealth Documents Law[9] and the APCA because it failed to hold "in-person" hearings. [] DEP held 10 virtual hearings and the virtual hearings do not satisfy the statutory requirement of "in-person" hearings.

*Ziadeh I*, slip op. at 8-9 (emphasis in original). Based on the foregoing, Senate Intervenors ask this Court to, *inter alia*, declare that "the [] Rulemaking is unconstitutional because it infringes upon the General Assembly's exclusive

---

[9] Act of July 31, 1968, P.L. 769, *as amended*, 45 P.S. §§1102, 1201-1208; 45 Pa. C.S. §§501-907.

authority to levy (or not levy) taxes," and to "permanently enjoin the Executive Department from implementing and enforcing the [] Rulemaking."  Senate Intervenors' ASR at 7, 8.[10]

In considering the instant cross-ASRs[11] with respect to the merits of the Senate's fourth Counterclaim, in granting a preliminary injunction, we previously observed:

> The Senate asserts that the Rulemaking is unconstitutional because it usurps its authority, as members of the General Assembly, to levy taxes under the Pennsylvania Constitution.  The power to levy taxes is specifically reserved to the General Assembly. P[a]. C[onst]. art. II, §1; *Thompson v. City of Altoona Code Appeals Board*, 934 A.2d 130, 133 (Pa. Cmwlth. 2007) ("It is well[ ]settled that '[t]he power of taxation . . . lies solely in the General Assembly of the Commonwealth acting under the aegis of the Constitution.'") (quoting

---

[10] We note that "[p]etitions for declaratory judgments are governed by the provisions of the Declaratory Judgments Act, 42 Pa. C.S. §§7531-7541." *Brouillette v. Wolf*, 213 A.3d 341, 357 (Pa. Cmwlth. 2019) (citation omitted).  As this Court has stated:

> Declaratory judgments are not obtainable as a matter of right. Rather, whether a court should exercise jurisdiction over a declaratory judgment proceeding is a matter of sound judicial discretion.  Thus, the granting of a petition for a declaratory judgment is a matter lying within the sound discretion of a court of original jurisdiction.

*Id.* (citations omitted).

[11] Pa.R.A.P. 1532(b) states, in relevant part:  "At any time after the filing of a petition for review in an . . . original jurisdiction matter, the court may on application enter judgment if the right of the applicant thereto is clear."  Judgment may be entered "'if a party's right to judgment is clear and no material issues of fact are in dispute.'  'In ruling on [ASRs], we must view the evidence of record in the light most favorable to the non-moving party and enter judgment only if there is no genuine issue as to any material facts and the right to judgment is clear as a matter of law.'"  *Eleven Eleven Pennsylvania, LLC v. State Board of Cosmetology*, 169 A.3d 141, 145 (Pa. Cmwlth. 2017) (citations omitted).

*Mastrangelo v. Buckley*, 250 A.2d 447, 452-53 (Pa. 1969)). While the General Assembly may delegate the power to tax, such as to a municipality or political subdivision, any such delegation must be "plainly and unmistakably conferred . . . and the grant of such right must be strictly construed and not extended by implication." *Mastrangelo*, 250 A.2d at 453 (emphasis in original); *see also* P[a]. C[onst]. art. III, §31 (placing restrictions on General Assembly's right to delegate its taxing authority). The Senate states that there has been no such delegation here under the APCA, the statutory authority relied upon by [] DEP in enacting the current Rulemaking.

The APCA specifically permits the imposition of fees to cover the costs of administering any air pollution control program authorized by the statute. Specifically, Section 6.3(a) of the APCA "authorizes the establishment of fees sufficient to cover the indirect and direct costs of administering the air pollution control plan approval process, operating permit program required by Title V of the [federal] Clean Air Act,[12] other requirements of the Clean Air Act and . . . to support the air pollution control program authorized by this act and not covered by fees required by [S]ection 502(b) of the Clean Air Act.[13]" 35 P.S. §4006.3(a).[14] Additionally, Section 9.2(a) of the APCA allows for the collection and deposit of "fines, civil penalties and fees into . . . the Clean Air Fund." 35 P.S. §4009.2(a).[15]

This Court has previously considered the question of what constitutes a proper regulatory fee as opposed to a tax. We have stated:

---

[12] 42 U.S.C. §§7661-7661f.

[13] 42 U.S.C. §7661a(b).

[14] Added by the Act of July 9, 1992, P.L. 460.

[15] Added by the Act of October 26, 1972, P.L. 989.

> A licensing fee, of course, is a charge which is imposed pursuant to a sovereign's police power for the privilege of performing certain acts, and which is intended to defray the expense of regulation. It is to be distinguished from a <u>tax</u>, or revenue producing measure, which is characterized by the production of large income and a high proportion of income relative to the costs of collection and supervision.

*Simpson v. City of New Castle*, 740 A.2d 287, 292 (Pa. Cmwlth. 1999) (emphasis added) (quoting *Greenacres Apartments, Inc. v. Bristol Township*, 482 A.2d 1356, 1359 (Pa. Cmwlth. 1984)).

We cannot . . . agree with Secretary McDonnell's argument that the allowance auction proceeds do not constitute a tax. First, it is undisputed that the auction proceeds are remitted to the [P]articipating [S]tates. Senate Ex[hibit] 22 (52 Pa.B. at 2482 ("The $CO_2$ allowances purchased in the multistate auctions generate proceeds that are provided back to the [P]articipating [S]tates, including the Commonwealth, for investment in initiatives that will further reduce $CO_2$ emissions.")). Secretary McDonnell's position is unpersuasive where it is undisputed that the auction proceeds are to be deposited into the Clean Air Fund, are generated as a direct result of the Rulemaking, and [] DEP anticipates significant monetary benefits from participating in the auctions. In addition, and importantly, it is unclear under what authority [] DEP may obtain the auction proceeds for Pennsylvania allowances purchased by non-Pennsylvania covered sources not subject to [] DEP's regulatory authority and which are not tethered to $CO_2$ emissions in Pennsylvania.

Second, the Rulemaking record, namely [] DEP's 2020 modeling, estimated that only 6% of the proceeds from the $CO_2$ allowance[] auctions would be for "programmatic costs related to administration and oversight of the $CO_2$ Budget Trading Program (5% for [DEP] and 1% for RGGI, Inc.)." 52 Pa.B. at 2508. The

9

remaining proceeds from the $CO_2$ allowance[s] auctions will be deposited into an air pollution reduction account within the Clean Air Fund maintained by [] DEP, with the use of such proceeds exclusively limited to the elimination of air pollution. *See* 52 Pa.B. at 25[2]5, 2545 (Rulemaking §§145.343 and 145.401).

Third, Secretary McDonnell acknowledged that from 2016 to 2021, the Clean Air Fund annually maintained between $20 million and $25 million in funds, the total expenditures exceeded the receipt of funds by $1 million for the years 2016 to 2020, but with the inclusion of anticipated $CO_2$ [allowance auction] proceeds, the estimated receipts for the 2022-23 budget year exceed $443 million. [Notes of Testimony], 5/10/2022, at 132-35. In fact, [] DEP's total budget for the 2021-22 fiscal year, *i.e.*, the total funds appropriated to [] DEP from the General Fund, was slightly in excess of $169 million. *See Pennsylvania Treasury, General Fund Current Fiscal Year Enacted Budget: Appropriated Departments,* https://www.patreasury.gov/transparency/budget.php (last visited June 23, 2022).

*Ziadeh I*, slip op. at 31-34 (emphasis in original and footnotes omitted).

Upon further review and consideration, we reaffirm our determination in this regard, and now hold that the Rulemaking constitutes a tax that has been imposed by DEP and EQB in violation of the Pennsylvania Constitution. Indeed, as the Pennsylvania Supreme Court explained long ago:

No principle is more firmly established in the law of Pennsylvania than the principle that a revenue tax cannot be constitutionally imposed upon a business under the guise of a police regulation, and that if the amount of a "license fee" is grossly disproportionate to the sum required to pay the cost of the due regulation of the business the "license fee" act will be struck down. The courts interfere with the discretion of the legislature in such matters only "where the regulations adopted are arbitrary, oppressive, or unreasonable." The regulations

10

> in question when tested by this standard require judicial interference with the legislative act creating them.

*Flynn v. Horst*, 51 A.2d 54, 60 (Pa. 1947) (citation omitted).[16]

As outlined above, in this case, it is undisputed that: (1) DEP and EQB anticipate significant monetary benefits from participating in the auctions, the proceeds obtained thereby are to be deposited into the Clean Air Fund, and they are generated as a direct result of the Rulemaking; (2) there is no cited authority under which DEP and EQB may obtain or retain the auction proceeds for Pennsylvania allowances that are purchased by non-Pennsylvania covered sources, which are not subject to DEP's and EQB's regulatory authority, and which are not tethered to $CO_2$ emissions in Pennsylvania; (3) only 6% of the proceeds from the auctions would be attributable to "programmatic costs related to administration and oversight of" the program, with a mere 5% going to DEP and EQB; and (4) the estimated moneys received by DEP and EQB from the auctions in a single budget year will exceed the total funds appropriated to DEP from the General Fund by nearly threefold. Where, as here, the moneys generated and received by the Commonwealth's participation in the auctions are "grossly disproportionate" to the costs of overseeing participation in the program or DEP's and EQB's annual regulatory needs, and relate to activities beyond their regulatory authority, the regulations authorizing Pennsylvania's participation in RGGI are invalid and unenforceable.

Stated simply, to pass constitutional muster, the Commonwealth's participation in RGGI may only be achieved through legislation duly enacted by the

---

[16] *See also Sunrise Energy, LLC v. FirstEnergy Corp.*, 148 A.3d 894, 907 (Pa. Cmwlth. 2016), *appeal denied*, 169 A.3d 1025 (Pa. 2017) ("[A]n agency cannot confer authority upon itself by regulation. Any power exercised by an agency must be conferred by the legislature in express terms. *Aetna Casualty and Surety Company v.* [*Insurance Department*, 638 A.2d 194, 200 (Pa. 1994)] (stating that an agency can only exercise powers 'conferred upon it by the Legislature in clear and unmistakable language') (citation omitted).").

Pennsylvania General Assembly, and not merely through the Rulemaking promulgated by DEP and EQB. As a result, we will grant Senate Intervenors' ASR in part.[17]

Accordingly, we grant Senate Intervenors' ASR asserting that the Rulemaking is an invalid tax; we declare that the Rulemaking is void; and we enjoin the Secretary from enforcing its provisions.

_____
MICHAEL H. WOJCIK, Judge

Judge Covey did not participate in the decision of this case.
Judge Fizzano Cannon did not participate in the decision of this case.
Judge Wallace did not participate in the decision of this case.

---

[17] Based on our disposition of the ASR on this Counterclaim, all remaining ASRs and applications filed by the parties and Intervenors in this case are dismissed as moot. Moreover, any claims raised by *amici* that are not raised by the parties and Intervenors will not be addressed by this Court in this matter. As the Pennsylvania Supreme Court has explained:

> [*A*]*micus* briefs cannot raise issues not set forth by the parties. *Hosp*[*ital*] *& Healthsystem Ass*[*ociatio*]*n of Pennsylvania v. Dep*[*artmen*]*t of Pub*[*lic*] *Welfare*, [888 A.2d 601, 606 n.10 (Pa. 2005)]; 4 Am.Jur.2d Amicus §7 (2005) ("[A]n *amicus* must accept the case before the court with the issues made by the parties. Accordingly, an *amicus curiae* ordinarily cannot inject new issues into a case which have not been presented by the parties.").

*Banfield v. Cortes*, 110 A.3d 155, 172 n.14 (Pa. 2015).

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Ramez Ziadeh, Acting Secretary : 
of the Department of Environmental :
Protection and Acting Chairperson of :
the Environmental Quality Board, :
           :
                 Petitioner :
           :
           v. : No. 41 M.D. 2022
           :
Pennsylvania Legislative Reference :
Bureau, Vincent C. DeLiberato, Jr., :
Director of the Legislative Reference :
Bureau, and Amy J. Mendelsohn, :
Director of the Pennsylvania Code :
and Bulletin, :
           :
              Respondents :

# **O R D E R**

AND NOW, this 1st day of November, 2023, the Application for Summary Relief (ASR) filed by Senate Intervenors in the above-captioned matter is **GRANTED** in part, in accordance with the foregoing Memorandum Opinion. The regulations promulgated by the Department of Environmental Protection (DEP) and the Environmental Quality Board (EQB) referred to as the "Trading Program Regulation" (Rulemaking), and found at 25 Pa. Code §§145.301-145.409, are **DECLARED VOID**. The Acting Secretary of DEP and Acting Chairperson of EQB is **ENJOINED** from enforcing the Rulemaking. All outstanding ASRs and applications filed in this case are **DISMISSED** as moot.

                             _____
                             MICHAEL H. WOJCIK, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Ramez Ziadeh, Acting Secretary : 
of the Department of Environmental : 
Protection and Acting Chairperson of : 
the Environmental Quality Board, : 
           Petitioner : 
            : 
      v. : No. 41 M.D. 2022
            : 
Pennsylvania Legislative Reference : 
Bureau, Vincent C. DeLiberato, Jr., : 
Director of the Legislative Reference : 
Bureau, and Amy J. Mendelsohn, : 
Director of the Pennsylvania Code : 
and Bulletin, : 
         Respondents : Argued: November 16, 2022

BEFORE:   HONORABLE RENÉE COHN JUBELIRER, President Judge
              HONORABLE PATRICIA A. McCULLOUGH, Judge
              HONORABLE MICHAEL H. WOJCIK, Judge
              HONORABLE ELLEN CEISLER, Judge
              HONORABLE LORI A. DUMAS, Judge

OPINION NOT REPORTED

DISSENTING OPINION
BY JUDGE CEISLER                       FILED: November 1, 2023

I must respectfully dissent from the majority's conclusion that Intervenors President Pro Tempore of the Pennsylvania State Senate Jake Corman, Senate Majority Leader Kim Ward, Chair of the Senate Environmental Resources and Energy Committee Gene Yaw, and Chair of the Senate Appropriations Committee Pat Browne (collectively Senate Intervenors), are entitled to summary relief regarding whether the Regional Greenhouse Gas Initiative (RGGI) administrative rule (Rulemaking) is a tax as opposed to a fee. I do so because there are genuine issues of material fact at this stage regarding whether the Rulemaking establishes a

tax or a fee, which deprives all of the parties to this matter of the ability to obtain summary relief on this point.

Section 6.3(a) of the Air Pollution Control Act

> authorizes the establishment of fees sufficient to cover the indirect and direct costs of administering the air pollution control plan approval process, operating permit program required by Title V of the Clean Air Act, [42 U.S.C. Ch. 85, Subch. V,] other requirements of the Clean Air Act[, *id.* §§ 7401-7675,] and the indirect and direct costs of administering the Small Business Stationary Source Technical and Environmental Compliance Assistance Program, Compliance Advisory Committee and Office of Small Business Ombudsman. This section also authorizes the [Environmental Quality Board] by regulation to establish fees to support the air pollution control program authorized by this act and not covered by fees required by [S]ection 502(b) of the Clean Air Act[, *id.* § 7661a(b)].

35 P.S. § 4006.3(a).[1] Petitioner Ramez Ziadeh, Acting Secretary of the Department of Environmental Protection (DEP) and Acting Chairperson of the Environmental Quality Board (Acting Secretary), argues, in relevant part, that this language authorizes the establishment of the emissions allowance auction process and creates a fee, whereas Senate Intervenors assert that this auction process produces nothing more than a tax in fee's clothing.

> The question of whether an enactment is a tax or regulatory measure is determined by the purposes for which it is enacted and not by its title. *City of Wilkes-Barre v. Ebert*, . . . 349 A.2d 520 ([Pa. Cmwlth.] 1975).
>
> Taxes have been defined as "burdens or charges imposed by the legislative power upon persons or property to raise money for public purposes, and to defray the necessary expenses of government." *Woodward v. City of Phila*[.], .

---

[1] Act of January 8, 1960, P.L. (1959) 2119, *as amended*, added by Act of July 9, 1992, P.L. 460.

. . 3 A.2d 167, 170 ([Pa.] 1938). This Court has previously noted that:

> The common distinction is that taxes are revenue-producing measures authorized under the taxing power of government; while license fees are regulatory measures intended to cover the cost of administering a regulatory scheme authorized under the police power of government.

[*City of*] *Phila*[.] *v.* [*Se. Pa. Transp. Auth.*], 303 A.2d 247, 251 ([Pa. Cmwlth.] 1973). In *National Biscuit Co. v.* [*City of*] *Philadelphia*, . . . 98 A.2d 182 ([Pa.] 1953), the Supreme Court identified the features of a license fee:

> The distinguishing features of a license fee are (1) that it is applicable only to a type of business or occupation which is subject to supervision and regulation by the licensing authority under its police power; (2) that such supervision and regulation are in fact conducted by the licensing authority; (3) that the payment of the fee is a condition upon which the licensee is permitted to transact his business or pursue his occupation; and (4) that the legislative purpose in exacting the charge is to reimburse the licensing authority for the expense of the supervision and regulation conducted by it.

*Id.* [ ], 98 A.2d at 188.

*White v. Med. Pro. Liab. Catastrophe Loss Fund*, 571 A.2d 9, 11 (Pa. Cmwlth. 1990). "A license fee is a sum assessed for a privilege, and to be valid the fee must be proportionate to the cost of administering the licensing ordinance. If the fee exceeds the reasonable cost of administration, it becomes an illegal tax which the law will not allow." *Martin Media v. Hempfield Twp. Zoning Hearing Bd.*, 651 A.2d 1171, 1173 (Pa. Cmwlth. 1994); *accord Costa v. City of Allentown*, 153 A.3d 1159, 1165 (Pa. Cmwlth. 2017) ("A municipality cannot impose a tax upon a business under the guise of exercising its police power, and, therefore, a license fee will be struck down if its amount is 'grossly disproportionate to the sum required to pay the

cost of the due regulation of the business.' *Flynn v. Horst*, . . . 51 A.2d 54, 60 ([Pa.] 1947).").

This Court, at the preliminary injunction stage, concluded that there is a reasonable likelihood that Rulemaking creates a tax for a number of reasons, including because "the auction proceeds are remitted to the participating states[;]" the proceeds of the Rulemaking will far exceed the cost of administering the $CO_2$ budget trading program; and those proceeds will swell the coffers of DEP's Clean Air Fund to more than twice the General Assembly's total budget appropriations to DEP for the 2021-2022 fiscal year. *See Ziadeh v. Pa. Legis. Ref. Bureau* (Pa. Cmwlth., No. 41 M.D. 2022, filed July 8, 2022), slip op. at 31-34 (Wojcik, J., single judge op.). Senate Intervenors now echo that reasoning, arguing that the emissions allowance auctions create a tax, rather than a fee, because the auctions will result in proceeds that grossly exceed the cost to DEP of administering the underlying regulatory scheme, may not actually return funds in some instances to DEP, and will not actually provide licenses to affected emitters. *See* Senate Intervenors' Br. at 22-28.

Even so, there is still a persuasive argument to be made that the emissions allowance auction process does not establish a tax. Acting Secretary asserts in his brief that the Rulemaking creates fees, because the auction proceeds will be put towards both administering and supporting DEP's air pollution control programs; the auction process creates emissions allowance credits, the value of which is set by the market, not the government; the allowance credits pertain to a voluntary act (*i.e.*, emission of $CO_2$); and the Rulemaking allows for $CO_2$ emitters to purchase such credits from other states and apply them to emissions made in this Commonwealth. *See* Acting Secretary's Br. at 34-37.

Based upon the record before us, it does not seem that the emissions allowance auction process would impose what could be deemed fees in the traditional sense, but, by the same token, it is not entirely clear that the proceeds raised thereby would constitute a tax. Given this, there is a genuine issue of material fact regarding the question of whether the Rulemaking establishes a tax or a fee. Accordingly, I would deny summary relief regarding this issue to both Ziadeh and Senate Intervenors, and dissent from the majority's decision to the contrary.

_____
ELLEN CEISLER, Judge